**Albert J. DIAZ, Plaintiff,**

v.

**INDIAN HEAD, INC., Defendant.**

**No. 74 C 2194.**

United States District Court,
N. D. Illinois, E. D.

March 12, 1975.

Norman Lettvin and Gerald S. Geren, Lettvin, Pigott & Gerstman, Chicago, Ill., for plaintiff.

David Acker, Winston & Strawn, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

DECKER, District Judge.

This is a diversity case in which a former employee seeks to have declared unenforceable a provision in his employment contract which precludes competition with his former employer for eighteen months subsequent to termination. Plaintiff Albert J. Diaz is a resident of Maryland. The defendant, Indian Head, Inc. (hereafter, "Indian Head") is a Delaware corporation, also doing business as "Information Handling Services" in Colorado. Indian Head is not a citizen of Maryland, but it has been licensed to do business in Illinois. The employment agreement specifically provides that New York law shall govern.

After Indian Head's motion for a preliminary injunction was denied, a trial was held on December 4, 1974. This opinion shall constitute the findings of fact and conclusions of law required under 52(a) of the Federal Rules of Civil Procedure.

Indian Head is currently one in a growing field of over a hundred companies in the microform publishing business. These companies reproduce various publications on little plastic microfilm cards.[1] Aside from gaining the ease of storing and preserving publications in this form, the buyer of these cards benefits when he desires esoteric, arcane, and hard to locate publications because the market demand may simply be too low to justify economically conventional printing or reprinting an item in the quantity needed. Because of this benefit, the companies in this field have to develop expertise in selecting publications to replicate and in advertising those selections to likely customers. A company which is unable to develop this expertise would either have to rely solely on unsolicited orders, or else end up replicating those very items which by definition are not in demand, and hoping to find, by chance, some one or more customers who wanted them. Because of similar considerations, these companies must develop contacts with likely customers including libraries and universities, and they must develop marketing methods. These goals are partly accomplished through representation of the

1. These cards are sometimes referred to as "fische" or "microfische".

companies at booths in conventions of likely customers, such as librarians.

Plaintiff Diaz developed in himself that special expertise that is so important in this field. Indeed, there is agreement that he is one of the ten or fifteen best qualified persons in the country for selecting those subjects and titles which would be profitable to replicate in microform. Further, in working for Indian Head and other such companies, Diaz has had substantial contact with many actual and potential customers. Part of that contact arose through his attendance of various conventions and through being involved with orders actually placed. In addition, while with Indian Head and other companies, Diaz has been in a position to plan the selection and marketing of titles. There is no doubt that the services of Albert J. Diaz would be of great value to a company in this field.

Diaz has been engaged in the microform business for over ten years before his employment with Indian Head, and no one has contended that his expertise or familiarity with customers became extraordinary only *after* he began that employment. He has however, stayed with the assets of a previous company, Microcard Foundation, as the ownership of the assets has changed over the years, with Indian Head the last such owner. On March 15, 1973, Indian Head actually purchased these assets from the National Cash Register Company. Subsequently in July, Diaz agreed to be employed by Indian Head. The purchase was not shown to be contingent upon the employment of Diaz, and there is no merit to defendant's claim that the services of Diaz were in some way ancillary to the sale of assets from National Cash Register to Indian Head.

The employment agreement between Diaz and Indian Head contained the following provisions:

"4. Either Employee or Indian Head may, on ninety days' written notice to the other party, elect to place the employment hereunder on a part-time consulting basis effective on or after November 30, 1973, for a period of eighteen months commencing upon the termination of the Employee's employment on a full-time basis, in which event, subject to the provision of this Section 4, (a) Employee shall be entitled to fees of $1,000 per month if the Employee shall become a consultant as a result of his election and fees of $1,833.34 per month if the employee shall become a consultant as a result of Indian Head's election and (b) Employee may engage in other business activities.

"During the period he is retained on a part-time consulting basis, Employee will render services as an independent contractor in an advisory and consultative capacity and not as an employee. Employee will, from time to time as requested by the President of IHS or Indian Head, consult and advise the executive officers of Indian Head and the operating executives of IHS and of the Microcard Editions business, to the best of his ability, with respect to such matters involving the business and affairs of IHS and of the Microcard Editions business as such officers and executives may present to him and will render his consultative and advisory services in writing, if so requested. Such services will be performed on a limited time basis, and the officers and executives desiring to consult with Employee will, insofar as reasonably practicable, consider the convenience of Employee in the timing of their request, and the failure of Employee, by reason of temporary illness or other cause beyond his control, or because of absence for reasonable periods, to respond to such requests during any such temporary period shall not be deemed to constitute a default on his part in the performance of his obligation to render such services. Any living or traveling expenses of Employee

while away from his headquarters to perform such part-time services shall be reimbursed by Indian Head.

"5. During the period Employee is working as an employee on a full-time basis and as a consultant, the Employee shall not engage, or be otherwise directly or indirectly interested, in any business which is competitive with the Microcard Editions business as such business then exists or as it existed at any time during the five-year period immediately preceding the date hereof. The parties agree that nothing in this Agreement shall in any way abrogate the right of Indian Head to enforce by injunction or otherwise the due and proper performance and observation by Employee or the terms and conditions of this Section 5 to be performed by him."

In February, 1975, Diaz elected to terminate his employment with Indian Head and accepted an offer of employment with the Northern Engraving Company. The company is chaired by the same individual whose family owned all the stock of the original Microcard Foundation. Diaz notified Indian Head of his intentions, effective in May, 1974. After May, Indian Head began tendering the $1,000 per month check called for by paragraph 4 of the employment agreement, for the part-time consulting services. Diaz, however, has never cashed these checks (nor returned them), and has indicated to Indian Head his desire to work for the Northern Engraving Company in competition with his former employer. He has also indicated his intention neither to consult nor accept remuneration therefor, and his belief that the noncompetition part of the agreement is not enforceable. Diaz's position at Indian Head has since been filled. Commendably, Diaz, according to his testimony, has refrained from actually competing pending this court's construction of the agreement.

New York law looks with disfavor upon agreements that prevent a talented person from engaging in his or her chosen profession. In the balance between the public interest in productivity, the employer's legitimate business interest, and the employee's interest, the first weighs more heavily. The method of enforcement of non-competition agreements is generally injunction. For these reasons, post-employment non-competition agreements have been held void unless they threatened irreparable injury to the employer's legitimate business interests. *Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267, 246 N.Y.S.2d 600, 196 N.E.2d 245 (1963); *Foster v. White*, 248 App.Div. 451, 290 N.Y.S. 394 (1936), *aff'd* 273 N.Y. 596, 7 N.E.2d 710 (1937). This injury generally falls into one of three categories:

(1) Trade secrets might be divulged. *Frederick Chusid & Co. v. Marshall Leeman & Co.*, 279 F.Supp. 913 (S.D.N.Y. 1968); *Lepel High Frequency Laboratorie v. Capita*, 278 N.Y. 661, 16 N.E.2d 392 (1938).

(2) Particular customers might be swept away by the new competitor, or there might be a loss of "good will" which had been bargained for at the time of employment. *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636 (1972); *Service Systems Corp. v. Harris*, 41 A.D.2d 20, 341 N.Y.S.2d 702 (1973); *Lynch v. Bailey*, 275 App.Div. 527, 90 N.Y.S.2d 359 (1949), *aff'd* 300 N.Y. 615, 90 N.E.2d 484 (1949).

(3) The employee may have been special, unique, or extraordinary. *Purchasing Associates, Inc. v. Weitz, supra, reversing* 39 Misc.2d 262, 240 N.Y.S.2d 476 (1963); *Clark Paper & Mfg. Co. v. Stenacher*, 236 N.Y. 312, 140 N.E. 708 (1923).

Outlines of these considerations were included in the recent cases of *Purchasing Associates, supra*, and *Karpinski v. Ingrasci*, 28 N.Y.2d 45, 320 N.Y.S.2d 1, 268 N.E.2d 751 (1971).

What these categories of injury all have in common is the prospect that the employee will *affirmatively* harm the former employer other than through

merely being productive for another employer. The employee may be *taking away* existing customers, as in *Service Systems Corp. v. Harris, supra*, where two days after the employee resigned, a major customer the employee had worked with announced it planned to take its business to the new employer. Where a trade secret is involved, what is at stake is a company asset which, like the business of a major customer, is not inextricably related to that special talent of the employee which New York law seeks to keep productive for the public benefit.

No issue of trade secrets is presented in this case. However, the question presented is whether, by virtue of his familiarity with the pool from which customers are drawn and with specific customers of Indian Head, competition from Diaz may amount to irreparable injury. The question must be answered in the negative. The customers, actual and potential, are already known or available to Indian Head's competitors. *Clark Paper & Mfg. Co. v. Stenacher, supra*.[2]

■ The names of libraries are not secret. Even if a list of known available customers was acquired at great expense over many years, a former employee would ordinarily ·be free to turn to it. *Leo Silfen, Inc. v. Cream, supra*. More importantly, Indian Head does not rely on a limited set of customers who supply most of its business, as might be the case of a medical practice in a small area, such as oral surgery. *Karpinski v. Ingrasci, supra*. Furthermore, the small volume per customer nature of Indian Head's business renders insignificant

the possibility that a few extremely important clients will follow Diaz rather than stay with their current microfilm supplier, or that a particular order will be preempted. See *Career Placement of White Plains v. Vaus*, 77 Misc.2d 788, 354 N.Y.S.2d 764 (1974).

■■ The remaining major issue is whether Diaz was in some way unique or extraordinary in the sense that New York policy requires the enforcement of his agreement with Indian Head. To begin with, no New York case has been cited or discovered in which such an agreement has been enforced on this rationale in a comparable fact (managerial or sales) situation in the absence of customer solicitation or trade secrets.[3] This qualification may of course be fulfilled where the individual is not merely very talented, but *what* he does is unique, such as the way *he* sings, *King Records, Inc. v. (James) Brown*, 21 A. D.2d 593, 252 N.Y.S.2d 988 (1964), or otherwise performs. See *Nassau Sports v. Peters*, 352 F.Supp. 867 (E.D.N.Y. 1972); *Nazarro v. Washington*, 81 N.Y.S. 2d 769 (Sup.Ct.1948). The fact that Diaz excels in his professed craft does not make his services "unique".

"More must, of course, be shown to establish such a quality than that the employee excels at his · work or that his performance is of high value to his employer." *Purchasing Associates, supra*, 246 N.Y.S.2d at 605, 196 N.E.2d at 249.

See *Frederick Brothers Artists Corp. v. Yates*, 271 App.Div. 69, 62 N.Y.S.2d 714 (1946), *aff'd*, 296 N.Y. 820, 72 N.E.2d 13 (1947); *Clark Paper & Mfg. Co., supra;* see also *Lynch v. Bailey, supra*.[4]

2. As the court in *Richard M. Krause, Inc. v. Gardner*, 99 N.Y.S.2d 592 (Sup.Ct.1950) said:

"The defendants are accused of having learned the plaintiff's sources of supply and the prices that the plaintiff charged to various customers. This information constitutes part of the general knowledge and experience that a person acquires in any business. The use of that knowledge and experience will not be enjoined." 99 N.Y.S.2d at 595.

3. A comprehensive article on this subject of non-competition agreements considers the unique character of an employee *only* in these terms. Harlan M. Blake, Employee Agreements Not to Compete, 73 Harv.L.R. 625, 647 (1960).

4. "The case in which the court interferes for the purpose of protection is where use is made, not of the skill which the man may have acquired, but of the secrets of the trade or profession which he had no right to

The court is aware of *Bradford v. New York Times Company*, 501 F.2d 51 (2d Cir. 1974), which found a vice president with 16 years experience with a single newspaper to be unique enough to make a non-competition agreement enforceable. The Second Circuit relied in part on the employee's high administrative position in so finding. The employee, Bradford, was being compensated for his period of non-competition, as is Diaz. However, Diaz's one year association with Indian Head is much less than Bradford's 16 years. Furthermore, *Bradford* paid little attention to New York's strong policy of keeping talented people productive. Finally, whatever doubts *Bradford* may have raised in Indian Head's favor are settled by the earlier New York case of *Purchasing Associates, supra*. There, a non-competition agreement was held invalid against one of the three original partners of a firm who withdrew after less than two years. The position of involvement of an original partner in the plans and decisions of the firm is analogous to the high positions of Diaz and Bradford. *Purchasing Associates* reversed trial court finding that the partner was unique. The case thus indicates that being near the top of a company for a few years does not make an employee unique.

Accordingly, this court concludes that plaintiff is entitled to a declaratory judgment that the agreement between Albert J. Diaz and Indian Head, Inc., is void and unenforceable insofar as it restricts Diaz from entering into competition after his full-time employment with Indian Head terminates.

Plaintiff may prepare a proper judgment order and it will be entered after notice to defendant.

reveal to anyone else—matters which depend to some extent on good faith." *Clark Paper & Mfg. Co., supra*, 236 N.Y. at 318, 140 N.

E. at 711, *quoting Herbert Morris Ltd. v. Saxelby*, 1 App.Cas. (1916) 688, 704.