Albert J. DIAZ, Plaintiff-Appellant,

v.

INDIAN HEAD, INC., a corporation, Defendant-Appellee.

No. 81–2692.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1982.

Decided Aug. 13, 1982.

Norman Lettvin, Epton, Mullin, Segal & Druth, Chicago, Ill., for plaintiff-appellant.

Philip S. Beck, Chicago, Ill., for defendant-appellee.

Before PELL, WOOD and CUDAHY, Circuit Judges.

PELL, Circuit Judge.

In this diversity case, the plaintiff, Albert J. Diaz, appeals from the district court's dismissal of his claim for commissions on sales completed after termination of his employment. The principal issues on appeal are whether the judge below properly invoked the doctrine of *res judicata* and whether he correctly interpreted the employment contract between the parties as barring Diaz's claim.

## I. FACTS

Diaz began negotiating an employment contract with Indian Head, Inc. (Indian Head) in late January, 1973. Diaz was then employed by National Cash Register Corporation (NCR). Indian Head was contemplating the acquisition of NCR's micropub-

lishing assets. These assets consisted of master negatives of books and periodicals marketed on microcards and microfiche and commonly referred to as "titles."

Diaz began working for Indian Head on March 15, 1973, the date Indian Head acquired Microcard Editions from NCR. Diaz's title was "Vice President and Publisher of Microcard Editions." At trial, Diaz described his position as one requiring the performance of "such duties and services of an executive and managerial nature as this position entails." Indian Head filled orders from the "1972–3 NCR Microcard Editions Catalogue of Publications" (1972–3 Catalogue), which Diaz had compiled during his previous employment with NCR. Diaz selected 160 new titles to be added to the 1973–4 and 1975 annual catalogues.[1] Although Diaz was informally referred to as the "title picker," he testified at trial that the actual selections were made by someone else. It is undisputed that Diaz's responsibilities did not include solicitation of orders.

A formal employment agreement between Diaz and Indian Head was not signed until July, 1973. It was backdated, however, to the date Diaz began working for the company. The contract, which was prepared by Indian Head's attorney and reflected concerns expressed by Diaz during the negotiation period, recited Diaz's title and duties as described above. It also outlined, in paragraph three, the terms relevant to Diaz's compensation which included salary and commission. Paragraph three also provided that Diaz's compensation was subject to revision at the close of the 1973 fiscal year.

Paragraph four of the contract provided that, on ninety days notice by either party, Diaz could be put on a part-time consulting basis "for a period of eighteen months commencing upon the termination of the Employee's employment on a full-time basis." The part-time consulting duties were to be compensated at a rate of $1,000 per month if Diaz initiated the arrangement.

---

1. The 1972–3 Catalogue acquired from NCR included 1,183 titles. In contrast to the 160 titles added by Diaz during his tenure with

Indian Head, Diaz selected 1,900 titles during one year of his employment with Brookhaven Press, Indian Head's competitor.

Paragraph five of the agreement provided that Diaz should not engage indirectly or directly in any business competitive with Microcard Editions during the time he was either a full-time employee or consultant to Indian Head.

Despite the fact that the employment agreement was not signed until July, 1973, Diaz began receiving commissions in March, 1973. These commissions were based on sales made from the 1972–3 Catalogue and included commissions on orders booked by Microcard Editions before it was acquired by Indian Head. Diaz's commissions were usually calculated on the basis of net delivered and invoiced sales. Orders received but not yet shipped were not generally included.

In January, 1974, however, Diaz received a commission statement that included $50,000 for sales not completed as of the end of November. The previous month Diaz had expressed some dissatisfaction with his employment arrangement and, in early January, had received an offer of employment from a competitor of Indian Head's. Indian Head characterized the $50,000 commission as a "goodwill gesture" indicative of the company's desire for Diaz to remain in its employ.

Later in January, 1974, Diaz was told that if he stayed with Indian Head beyond December 1, 1974, he would probably be put on a salary plus bonus scheme of compensation and would no longer be paid on a commission basis. In February, 1974, Diaz inquired about his commission rate for the 1974 fiscal year. He was told that the rate would be lowered. According to Indian Head, this change was made, pursuant to the power reserved in the contract, because Indian Head contemplated a significant increase in sales generated by salesmen. The definition of "net sales" in Diaz's contract did not provide for salesmen's commissions to be deducted before the commission was calculated. Had Diaz's commission rate remained constant, he might well have received what the company viewed as an unwarranted windfall.

A few days after this conversation, Diaz resigned his position with Indian Head, effective May 10, 1974, and accepted an offer of employment from Northern Engraving Company (Northern).

Diaz received his last monthly commission statement from Indian Head on or about June 20, 1974. Indian Head then began paying the $1,000 per month consulting fee provided for in paragraph five of the contract. Diaz never cashed these consulting fee checks.

In August, 1974, Diaz commenced suit in federal district court to have the eighteen-month noncompetition clause in the contract declared unenforceable (*Diaz I*). In its order, reported at 402 F.Supp. 111 (N.D. Ill.1975), the district court held that the clause was unenforceable insofar as it precluded Diaz's competing with Indian Head once his full-time employment with that company terminated. The district judge also held that Diaz was not obligated to perform any consulting services for Indian Head. Diaz was ordered to return all the consulting fee checks to Indian Head.

Indian Head appealed this order. Diaz cross-appealed on the ground that he should have been afforded timely notice and an opportunity to present evidence regarding return of the checks. On September 2, 1975, this court affirmed Judge Decker's order in an unpublished order.

On April 6, 1976, Diaz filed the present lawsuit (*Diaz II*), seeking additional compensation for commissionable items selected by Diaz, the sale of which was consummated after termination of his employment with Indian Head. The commission claim falls into two categories. Diaz claims $5,363.63 based on sales booked prior to May 10, 1974 but shipped thereafter. He also claims commissions on sales made from the 1973–4 and 1975 catalogues that were booked after he left Indian Head. Including these latter commissions, Diaz claims a total of $105,186.59.

Appearing before Judge Flaum, Indian Head moved to dismiss Diaz's suit in May, 1976, on the grounds that the action was barred by *res judicata* and that the employ-

ment agreement demonstrated on its face that Diaz was not entitled to additional compensation. The trial judge denied this motion in December, 1976, finding that *Diaz II* was "based on a separate and distinct cause of action even though it relate[d] to the same contract involved in [*Diaz I*]," and that Diaz had stated a claim upon which relief could be granted.[2]

In August, 1977, Indian Head moved to join Northern as the real party in interest, arguing that Northern would be entitled to any recovery Diaz obtained from Indian Head. Judge Flaum denied this motion.

*Diaz II* was reassigned to Judge Perry for trial. The trial was held in March, 1981. At the close of the plaintiff's case, Indian Head moved for dismissal pursuant to Rule 41(b) of the Federal Rules of Civil Procedure and orally renewed its motion to dismiss on the ground of *res judicata*. Indian Head did not renew its motion regarding Northern.

On September 18, 1981, Judge Perry dismissed Diaz's action on the merits. He held that the suit was barred by *res judicata* and that Diaz had no interest in the action because Northern would be the sole beneficiary of any judgment against Indian Head.[3] Judge Perry also held that the employment agreement was unambiguous and barred any claim for commissions on sales completed after Diaz's departure from Indian Head.

## II. RES JUDICATA

The doctrine of *res judicata* extends "not only to those matters actually determined in the prior case, but also to matters properly involved which could have been raised in the prior suit." *Gasbarra v. Park-Ohio Industries, Inc.*, 655 F.2d 119, 121 (7th Cir. 1981). As the appellee concedes, Diaz did not litigate his present claim for post-termi-

nation commissions in his earlier suit. The issue, therefore, is whether the claim now raised arises out of the "same basic factual situation," *Himel v. Continental Illinois National Bank and Trust Co.*, 596 F.2d 205, 209 (7th Cir. 1979) (citation omitted), as did *Diaz I* and could properly have been raised in the earlier suit. *Accord, Gasbarra*, 655 F.2d at 121 (the test is whether " 'the entire amount claimed to be due plaintiff arises out of one and the same act or contract.' " (quoting *Ernest Freeman & Co. v. Robert G. Regan Co.*, 332 Ill.App. 637, 645, 76 N.E.2d 514, 517–18 (1947)).

Diaz poses three arguments against the applicability of *res judicata*. First, he claims that Judge Flaum's earlier rulings that *Diaz I* was not a bar to *Diaz II* constitute the law of the case and should not have been disturbed by Judge Perry. Second, the appellant urges that he could not have brought his claim for post-termination commissions at the time of *Diaz I* because Indian Head's liability was impossible to calculate until after the trial of the first case concluded. Third, Diaz contends that the only issue presented in *Diaz I* was the validity of the noncompetition clause[4] and, therefore, the issues raised in the second suit were not and could not have been litigated earlier. We will address each of these contentions in turn.

■ Judge Flaum's rulings that *res judicata* does not bar *Diaz II* were interlocutory and could be "reconsidered and reviewed at any time prior to final judgment." *Pittston-Luzerne Corp. v. United States*, 86 F.Supp. 460, 461 (M.D.Pa.1949) (citation omitted). As Professor Moore has observed:

> Since a lower court cannot by its law of the case bind a higher court having appellate jurisdiction over it, the only sensible

---

**2.** Judge Flaum also denied a renewed motion arguing the same bases for dismissal on July 20, 1979.

**3.** Indian Head does not urge affirmance on this ground and, therefore, we do not discuss it further in our disposition of this case.

**4.** Diaz maintains that his cross-appeal relating to the return of the consulting fee checks was premised only on procedural grounds and, as a result, *Diaz I* involved no claim for moneys owed pursuant to the contract. We do not dispute this point; however, we do not find it dispositive of whether the doctrine of *res judicata* is applicable.

thing for a lower federal court ... to do is to set itself right instead of inviting reversal above, when convinced that its law of the case is substantially erroneous. 1B *Moore's Federal Practice* ¶ 0.404[1], at 407 (1982) (footnotes omitted). We think Professor Moore's analysis is applicable to the situation in which one federal district judge believes the ruling of another district judge to be erroneous, as Judge Perry did in this case. We do not think that Judge Perry was foreclosed by the law of the case from holding that *Diaz II* was barred by *res judicata*.

■ Similarly, we are not persuaded that it was impossible for Diaz to raise the instant claim at the time of *Diaz I* because the amount allegedly owing was not then certain. Like the plaintiff in *Gasbarra*, Diaz confuses the issues of liability and damages. 655 F.2d at 122–23. Plaintiff Gasbarra had originally filed a suit claiming entitlement to salary, bonuses, and fringe benefits as a result of the defendant's wrongful and ineffective attempt to terminate his employment. The trial court held in that case that the contract had not been terminated and that Gasbarra was entitled to the accrued salary but not to bonuses or fringe benefits.

The contract between Gasbarra and Park-Ohio was properly terminated following this first suit. Three years later, Gasbarra again sued. He claimed noncontractual fringe benefits, the entitlement to which arose during the period between the first action and the effective termination of the contract. The district court granted summary judgment for the defendant on the ground of *res judicata*. On appeal, Gasbarra argued that he could not have sought these benefits in his first suit because his claim to them had accrued subsequent to the first judgment. This court affirmed the grant of summary judgment, stating that:

> [T]he question of the defendant's liability for the fringe benefits had clearly accrued and was ripe for decision [at the time of the first suit] .... The question could have been resolved either by declar-

atory and injunctive relief or by a determination of liability which would have been res judicata in suits for future installments.

*Id.* at 123.

Further, the amount of commissions Diaz asserts he was due on sales completed during fiscal 1974 was determinable following the close of that fiscal year on November 30, 1974. Even if no final sales information for that period was available until January, 1975, as Diaz suggests, the hearing at which Judge Decker ordered Diaz to return the consulting fee checks did not occur until March 25, 1975.

In arguing that the present compensation claim did not arise out of the same factual situation as *Diaz I*, the appellant relies on *Himel v. Continental Illinois National Bank and Trust Co.*, 596 F.2d 205 (7th Cir. 1979). In *Himel*, the beneficiaries of a testamentary trust filed suit in 1972 charging the trustee with mismanagement of the trust estate and breach of fiduciary duty (*Himel II*). Eleven years earlier, the beneficiaries had succeeded in their suit to have the investment clause of the trust instrument reformed. (*Himel I*). The district court granted summary judgment for the trustee in *Himel II* on the ground that *Himel I* was a bar to the second suit insofar as *Himel II* related to investment decisions made prior to 1961.

This court reversed the judgment below, holding that, although both suits were directed at the poor performance of the trust, they arose out of "independent factual situations alleged to be the *cause* of that effect," *id.* at 209, and were thus premised on different causes of action. The court noted that, had the beneficiaries proved mismanagement in 1961, that fact would not have affected the court's grant or denial of the request for reformation. The court also found that a question of material fact existed as to whether the plaintiffs in the second suit had known or should have known in 1961 of the alleged earlier misconduct. *Id.* at 210.

■ *Himel II* is distinguishable from the present suit. *Himel I* focused on the trust instrument itself and the court reformed the investment clause to further the testator's expressed intent of providing the maximum income possible. In *Himel II*, however, neither the testator's intent nor interpretation of the trust instrument was at issue. By contrast, both *Diaz I* and *Diaz II* involved issues requiring interpretation of the contract between the parties; further, the issues in both cases pertain to the post-employment relationship between Diaz and Indian Head. As in *Gasbarra*, any claim that Diaz might have to post-termination commissions was one of which he should—and certainly could—have been aware in 1974 and which had fully accrued at that time.

■ Although Diaz did not litigate the question of post-termination commissions in his first suit, apparently on the advice of counsel, there is no reason why he could not have done so. Contrary to the appellant's suggestion at oral argument that the purely declaratory relief sought in *Diaz I* precluded a claim for such commissions, this court has previously recognized that:

> [W]here law and equity have been united and a litigant can present all his grounds for relief, whether legal or equitable, inconsistent, alternative or hypothetical, in a single cause of action he should be held to have but one cause of action and final judgment on the merits is res judicata as to all matters, legal and/or equitable, in support or defense of that cause of action.

*Lambert v. Conrad*, 536 F.2d 1183, 1185 (7th Cir. 1976) (quoting 1B *Moore's Federal Practice, supra,* ¶ 0.410, at 1156–57); *see also, id.* ¶ 0.405[7], at 764–65. The plaintiff in *Lambert* had argued that *res judicata* was inapplicable because he sought only injunctive relief in his first suit whereas he claimed damages in his second suit. This court's rejection of Lambert's argument

provides sound support for our conclusion in the instant case that Judge Perry properly found *res judicata* a bar to Diaz's suit.

We recognize, however, that the *res judicata* issue in this case is a close one. We therefore turn to an alternative ground relied upon by the judge below: that the contractual relationship between the parties precludes Diaz's claim.

## III. CONTRACTUAL RELATIONSHIP

■ Two preliminary points must be made. First, by virtue of the contract between the parties, the law of New York governs interpretation of the employment agreement. Second, we recognize that because Indian Head drafted the employment agreement, any ambiguities therein must be construed against Indian Head. *Bank of North Carolina, N. A. v. Rock Island Bank,* 570 F.2d 202, 207 (7th Cir. 1978). This canon of construction is relevant, however, only to the extent that the contractual language itself is ambiguous. Further, because Diaz had a significant amount of input into the final contract, the canon has somewhat less relevance to this case than it does to one involving a form contract which was signed without negotiation between the parties.

The judge below made numerous findings as to why the contract barred Diaz's claim. The relevant findings and points urged by the appellee logically fall into the following categories: (1) Diaz was not the "procuring cause," *Richer v. Khoury Brothers, Inc.,* 341 F.2d 34, 38 (7th Cir. 1965), of the sales for which he claims commissions; (2) the language of the contract clearly bars the claim; (3) the extent of the executive duties involved in Diaz's position precludes the claim; and (4) the practical construction given the contract by the parties evidences no intent to pay Diaz post-termination commissions.[5] Although there is some interrelationship between these four categories, we shall discuss each in turn.

---

**5.** As noted in Section I, *supra*, Diaz claims commissions falling into two categories: those related to sales booked but not shipped as of May 10, 1974, and those relating to sales both booked and shipped after he severed his full-

time employment relationship with Indian Head. It is apparent that if Diaz's claim to commissions falling within the first category fails, his claim to commissions falling within the second category similarly cannot succeed.

## A. Procuring Cause

Diaz claims that he was the "procuring cause" of all sales made by Indian Head during fiscal years 1974 and 1975, and is therefore entitled to the resulting commissions. He relies on this court's holding in *Richer v. Khoury Brothers, Inc.*, 341 F.2d 34 (7th Cir. 1965). In *Richer*, the plaintiff's job was to induce mail order companies to insert descriptions and photographs of the defendant's merchandise in their catalogues and retail basic lists. The court held that Richer was entitled to commissions on sales placed after termination of his employment, stating:

> Plaintiff as the procuring cause of the sales, under the agreement of the parties . . . is entitled to commissions notwithstanding the fact that the sales were made or consummated subsequent to the termination of the plaintiff's services. And, in view of the nature of the subject matter here involved—the procuring or continuation of catalogue listings to produce future sales during the period the catalogue is to serve and be current—makes it entirely reasonable that in the absence of an express cut-off limitation compensation on a commission basis dependent on such future sales include commissions on such sales occurring subsequent to termination of the salesman's or representative's contract.

*Id.* at 38. The *Richer* case was governed by Illinois law whereas the contract between Diaz and Indian Head is, by its own terms, governed by New York law.

Diaz asserts, however, that New York law also has recognized the procuring cause doctrine in *Bendevena v. Richard Fuchs Real Estate, Inc.*, 89 Misc.2d 466, 391 N.Y.S.2d 939 (1976). In that case, the plaintiff was a real estate agent. She claimed two commissions: one for a sale that was fully negotiated prior to her departure from the defendant's employ, and one received by the broker relating to sale of a property that she had placed with a Multiple Listing Service while she was working for the defendant broker. The court found that Bendevena was entitled to both commissions. As to the fully negotiated sale, the court stated that "the salesperson accomplished the purpose of her agency during the term of her employment, she procured a buyer, ready, willing and able to perform according to the terms of the offer, and the salesperson was the procuring cause of the eventual sale." 391 N.Y.S.2d at 939–40. Concerning the Multiple Listing sale, the court noted that "[t]he services for which the broker earned the commission were all performed by the salesperson prior to termination. Therefore, the salesperson had earned her share prior to termination." *Id.* at 940.

Although the *Bendevena* court employed the term "procuring cause," it also recognized that the plaintiff was a "salesperson" and so characterized her repeatedly in its opinion. We are not convinced, therefore, that a New York court would necessarily apply the procuring cause doctrine to one whose duties involved no direct sales effort. Even *Richer*, whose employment duties were more analogous to those of Diaz than were Bendevena's, was in a sense a "salesman" in that he had to induce someone else, mail order companies, to carry descriptions and photographs of his employer's merchandise. By contrast, Diaz was involved in no direct solicitation. His job did not require persuasion of any third party to act for the benefit of Indian Head. It is also significant that both Richer and Bendevena performed the entirety of the duties for which they claimed commissions while they were in the respective defendants' employ. Diaz, on the other hand, compiled 1,183 of the titles contained in the catalogues while he was employed by NCR, adding only 160 during his tenure with Indian Head. Diaz is essentially asserting a claim against Indian Head for work he performed while an employee of NCR. In doing so, he overlooks the fact that Indian Head obtained the list of 1,183 titles as part of its purchase of Microcard Editions from NCR.

In summary, we are not convinced that *Richer* is consistent with New York law. Even if *Richer* and *Bendevena* were found to be consistent with each other, however, Diaz's claim is distinguishable.

His duties were less sales-related than those of either Richer or Bendevena; further, the activity for which he claims commissions was largely completed before he entered into an employment relationship with the defendant. In light of these distinctions, we are inclined to think that Diaz was not the "procuring cause" of the sales for which he now claims commissions. It is not necessary to rest our disposition on this question of characterization, however, because *Richer* specifically limited its holding to the situation in which the contract provided no "express cut-off limitation," 341 F.2d at 38, on commissions.

## B. The Language of the Contract

Paragraph three of the employment agreement between Diaz and Indian Head is critical. The introductory portion of that paragraph states:

> *During the period he is employed by Indian Head on a full-time basis,* Indian Head will pay Employee, as long as he shall not be in default hereunder, the following compensation:

(emphasis added). Subparagraph 3(a) relates to Diaz's salary. Subparagraph 3(b), on which Diaz bases his claim, states:

> As additional compensation, (1) a sales commission payable monthly as earned at the rate of 1¾% of the first $1,150,000 of net sales in each of Indian Head's fiscal years of Commissionable Items (as hereafter defined) and a sales commission of 5% of the net sales in excess of $1,150,000 in each fiscal year of Commissionable Items.

Subparagraph 3(b) cannot be read without reference to the introductory language quoted above. Attempting to do so ignores the structure of the paragraph. More importantly, subparagraph 3(b), read alone, gives no indication who is to pay the commissions, to whom they are due, or for what period of time they are payable. The intro-

ductory language provides this information, indicating that Indian Head is to pay Diaz the commission "[d]uring the period he is employed ... on a full-time basis" and is not "in default" of the contract.

Other aspects of the contract reinforce our conclusion that Diaz's right to commission is premised on a full-time employment relationship with Indian Head. Paragraph three also gave Indian Head the right to adjust—or eliminate—Diaz's commissions following the end of the 1973 fiscal year, so long as Diaz's total compensation did not fall below a stated level.[6] In fact, Ted Lee had decided to exercise this option and had so informed Diaz in early 1974. If Diaz were to be awarded all the commissions he seeks, he would receive commissions for both fiscal years 1974 and 1975 at the rate set in his contract for fiscal year 1973. The result would be that Diaz received far more in commissions by quitting his job than he would have received had he remained in Indian Head's employ.

Two other sections of the contract also suggest that Diaz is not entitled to commissions on orders booked after he left Indian Head. Another section of paragraph three states that Diaz's compensation would cease: (1) upon his death; or (2) thirty days after Indian Head suspended him for any of certain enumerated causes. This section immediately follows the portion of the contract which defines "commissionable items"; therefore, we read the reference to "compensation" as embracing both salary and commissions. Paragraph four delineates the post-employment rights and obligations of the parties. It makes no reference to commissions. Each of these sections of the contract is consistent with the introductory language of paragraph three, quoted *supra*, which limits Diaz's right to commissions to the period of his full-time employment by Indian Head.

---

**6.** Diaz suggests in his brief that Lee had no right under the contract to reevaluate his commission rate in early 1974 because the contract stated that: "it is contemplated that immediately following the end of Indian Head's 1973 fiscal year, [such reappraisal regarding salary

and commissions will be made]." We do not believe that anything in this contractual provision is inconsistent with Lee's reconsidering Diaz's compensation scheme something over a month after the close of the 1973 fiscal year.

The language of the contract clearly predicates Diaz's right to commissions on his being a full-time employee. This is dispositive of Diaz's claim that he is entitled to approximately $100,000 total commissions on orders that were booked after he left Indian Head because these orders bear no relationship to Diaz's status as a "full-time employee."

■ Whether the contractual language similarly concludes Diaz's claim to commissions on orders booked during his tenure at Indian Head but shipped thereafter depends on whether his right to the commissions vested at the time of booking or at the time of shipping. New York law provides that, absent a clear agreement to the contrary, the right to such commissions vests at the time of booking. *Grattan v. Societa per Azzioni Cotonificio Cantoni*, 2 Misc.2d 861, 151 N.Y.S.2d 875, 884 (Sup.Ct.1956).

■ Diaz argues that he is entitled to the commissions because his contract with Indian Head is worded "substantially the same" as the contract at issue in *Noening v. Bedford Mills, Inc.*, 239 N.Y. 618, 147 N.E. 220 (1925) (per curiam), in which the court held that the plaintiff was entitled to post-termination commissions. The pertinent language of the contract in *Noening* stated that the plaintiff was entitled to commissions "during the continuance of this contract." *Id.* at 619, 147 N.E. at 220. We disagree with Diaz's assertion that "during the continuance of this contract" is "substantially the same" as "during the period he is employed . . . on a full-time basis." A contract can remain in force, especially if it details post-employment rights and obligations, after the employee's full-time duties with the employer cease. *Noening* is not persuasive support for Diaz's claim.

■ The Indian Head-Diaz contract did not explicitly provide, however, that Diaz's right to commissions vested only when the goods were shipped. By contrast, the contracts at issue in *In re Burnbrier's Estate*, 92 N.Y.S.2d 653, 654 (1949), *aff'd*, 277 App. Div. 765, 97 N.Y.S.2d 710 (1950), and *O'Brien v. Cuno Engineering Corp.*, 87 N.Y. S.2d 497, 498, *aff'd*, 276 App.Div. 816, 93

N.Y.S.2d 704 (1949), did specifically refer to the shipping date, suggesting that as the point at which the right to commissions vested. Bearing in mind that any ambiguity in the contract must be construed in favor of the person claiming the commissions, *Grattan v. Societa per Azzioni Cotonificio Cantoni*, 2 Misc.2d 861, 151 N.Y.S.2d 875, 884 (Sup.Ct.1956), we conclude that the language of the employment agreement between Diaz and Indian Head is not sufficiently specific as to when Diaz's interest in commissions vested. The language of the contract, therefore, does not clearly preclude Diaz's claim to commissions on sales booked before May 10, 1974 but shipped thereafter.

## C. The Extent of Diaz's Executive Duties

■ The district judge found, *inter alia*, that the executive duties undertaken by Diaz barred his claim to post-termination commissions. New York law recognizes that some employees are paid commissions as part of a total compensation package and in consideration for performance of duties in addition to solicitation of orders. *See Sommer v. Edward Ermold Co.*, 275 App. Div. 629, 92 N.Y.S.2d 326 (1949). In such a case, when the employee ceases performing these duties, his right to all compensation, including commissions, similarly ends. 92 N.Y.S.2d at 327–28.

In *Sommer*, the plaintiff was the local sales manager of the defendant company and was employed both to obtain orders and to attend to the servicing of machinery and parts manufactured by the defendant. In denying Sommer's claim for post-termination commissions, the court stated:

> [T]he plaintiff was employed not as an ordinary salesman, but as the local sales manager in charge of a territory and responsible for the servicing as well as the selling of the defendant's machines and parts. It is obvious that the plaintiff's discharge not allegedly wrongful put an end to all opportunity for servicing of the defendant's product.

92 N.Y.S.2d at 327.

■ Numerous facts support the trial judge's conclusion in this case that a portion

of Diaz's duties were executive in nature rather than sales-related and that, therefore, the *Sommer* rationale is applicable. Diaz's title was "Vice President and Publisher of Microcard Editions." At trial, the plaintiff described his position as one requiring the performance of "executive and managerial" duties and services. Despite the fact that Diaz was informally referred to as the "title picker," the appellant testified that the actual selections were made by someone else. Perhaps most persuasive is the fact that only 160 new titles were added to the Microcard catalogues during Diaz's employment with Indian Head whereas Diaz selected 1,900 titles during one year of his employment with Brookhaven Press.

*Sommer* suggests that Diaz's claim for post-employment commissions is barred because his commission was earned, in large part, through performance of duties that necessarily ended the day he abandoned a full-time employment relationship with Indian Head. The *Sommer* court did not rely solely, however, on the nature of the duties performed by the plaintiff in that case. The court also looked to the practical construction given the contract by the parties. A similar examination of the practical construction given the instant contract furthers our conclusion that the *Sommer* rule is applicable to this case.

### D. Practical Construction of the Contract

In ascertaining when Sommer's right to commissions vested, the New York Supreme Court found it significant that the plaintiff was paid commissions under his contract on orders obtained by the company prior to the commencement of his employment that were filled after he entered the defendant's employ. 92 N.Y.S.2d at 327. Relying on this fact, the *Sommer* court held that the practical construction given to the agreement made clear "an intention that commissions were due and payable only for goods shipped while the plaintiff was still in the defendant's employ." *Id.*

Similarly, in an earlier New York case, *Ortega v. Collins New York Medical Institute*, 127 App.Div. 293, 111 N.Y.S. 427 (1908), the plaintiff sought commissions on accounts of his department for which payment was received only after his resignation. The court noted that "[w]hen [Ortega] began, he was entitled to his commission on the total receipts of his department each month, although some or much of it was on business that had come in before his employment, and when he ended, he was not entitled to continue drawing commissions on money subsequently received on business current during his employment." 111 N.Y.S. at 428.

When Indian Head acquired Microcard Editions from NCR, there were outstanding orders. It is undisputed that Diaz received commissions, pursuant to his employment agreement, calculated on these orders. Diaz claims, however, that the *Sommer* and *Ortega* cases are distinguishable because in both those cases other employees of the defendant companies had been responsible for initially booking the orders. By contrast, Indian Head had no "previous" title picker; instead, it was Diaz himself who had compiled the title list from which the orders were booked. As noted previously in Section III(A), *supra*, Diaz overlooks the fact that he was not employed by Indian Head at the time he compiled the majority of the titles offered in the pertinent catalogues. Diaz's extremely narrow reading of *Sommer* and *Ortega* is unjustified. Those courts were examining the practical construction given a contract by the parties. Both courts held that when an employee receives commissions on orders he did not himself place, it is a strong indication that the right to commissions vests at the time the order is shipped rather than when it is placed. We think that this analysis is applicable to the case at bar.

Concluding that Diaz's right to commissions vested at the time of shipment is also consistent with the fact that his commissions were generally calculated on shipped and invoiced orders. The only occasion on which he received a commission in *advance* of shipment was in January, 1974, when his commission included $50,000 for sales not completed as of the end of November, 1972.

This exception from Indian Head's normal practice of calculating Diaz's commissions on shipped orders followed immediately upon Diaz's expressing dissatisfaction with his employment and, according to the defendant's testimony, represented a goodwill gesture.

The practical construction given the Diaz-Indian Head contract by the parties indicates that Diaz's right to commissions vested at the time of shipment and, therefore, the contract bars his claim pertaining to orders booked but not shipped as of May 10, 1974.

## IV. CONCLUSION

The doctrine of *res judicata* bars Diaz's suit because the claims raised in both his first suit and the instant action pertain to his post-employment relationship with Indian Head. All the claims require interpretation of the employment agreement between the parties. Diaz could, and should, have been aware of the claim he now presses at the time he brought his first suit.

Assuming, *arguendo*, that *res judicata* is inapplicable, Diaz's present claim is barred by his employment agreement with the defendant. His claim for commission on orders booked following the termination of his full-time employment relationship with Indian Head is inconsistent with the clear language of paragraph three of the employment agreement.

The employment agreement is not so explicit as to whether Diaz's right to commissions vested at the time of booking or shipping orders. The practice of the parties, however, does indicate that Diaz's interest in commissions vested only when the orders were shipped because he was paid commissions by Indian Head on orders booked before the defendant acquired Microcard Editions. This practical construction of the parties' contract, together with the extent of Diaz's managerial duties, brings the case at bar squarely within the rule of *Sommer v. Edward Ermold Co.*, 275 App.Div. 629, 92 N.Y.S.2d 326 (1949), thereby barring Diaz's claim for all post-termination commissions.

Having duly considered all the arguments raised by the appellant, we hold that the judgment of the court below dismissing Diaz's cause of action is hereby

AFFIRMED.

CUDAHY, Circuit Judge, concurring in part and dissenting in part.

I do not believe that Diaz's suit is barred by principles of res judicata. In addition to determining whether the claim in the instant suit "could properly have been raised in the earlier suit," *ante* at 562, I believe the court must also ascertain whether the claim presented here is such that one would normally expect a litigant to have joined it with the claims presented in the prior suit. *Cf.* 18 *Wright, Miller & Cooper, Federal Practice and Procedure* § 4407, at 49–54 (1981) (analyzing the concept of res judicata merger under the principles governing the mandatory joinder of claims). Diaz's damage claim does not pass this test.

I agree with the majority that Diaz's employment contract does not give him the right to commissions on sales booked after Diaz terminated his employment. But I would award Diaz commissions on sales booked *before* he terminated his employment even though the shipments did not occur until after he left Indian Head. The contract is, as the majority also concludes, ambiguous on this point. But bearing in mind the principle recognized by the majority "that because Indian Head drafted the employment agreement, any ambiguities therein must be construed against Indian Head," *ante* at 564; *see ante* at 567, I interpret paragraph three of the contract to give Diaz commissions earned on all booked sales "[d]uring the period he [was] employed at Indian Head." Moreover, this interpretation of the contract is supported by the payment of commissions in advance of shipment (but after booking) in January 1974. I would not rely on Indian Head's explanation of the practice, namely that Indian Head adopted this approach gratuitously to placate Diaz. I would give weight to the practice as a contemporaneous construction of the contract. Hence, I would

award Diaz damages for the amount of commissions earned, based upon sales booked at the time he left Indian Head's employ.

To this extent, I respectfully dissent.