Leo **BURROUGHS, Jr., Esther Robinson, Donald Schatz, Earl Whatley, Steven Goldsmith, Anton Seals, Ishmael Seye, Lizzie Mae Bonner, and the Five Block Club, Plaintiffs,**

v.

Carla **HILLS, Secretary, Department of Housing and Urban Development, John Waner, individually and in his official capacity as Director of the Chicago area office of the Department of Housing and Urban Development, Martin Rogan, individually and in his official capacity as Deputy Director of the Chicago area office of the Department of Housing and Urban Development, William Miller, individually and in his official capacity as Director of the Housing Management Division of the Chicago area office of the Department of Housing and Urban Development, John Davis, individually and in his official capacity as Director of Property Division of the Chicago area office of the Department of Housing and Urban Development, Stanley C. Nykiel, individually and in his official capacity as realty specialist in the Housing Management Division of the Chicago area office of the Department of Housing and Urban Development; and Seward Rist, Defendants.**

No. 76 C 1640.

United States District Court,
N.D. Illinois, E.D.

March 8, 1983.

Robert L. Graham, Jenner & Block, Jane A. McAtee, Chicago, Ill., for plaintiffs.

Dan K. Webb, U.S. Atty., Nancy K. Needles, Asst. U.S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

This action was instituted in 1976, charging various officials of the United States Department of Housing and Urban Development ("HUD") with violations of state and federal law in connection with the maintenance of HUD-owned property in Chicago. It is now before the court on the parties' cross-motions for summary judgment upon a stipulation of facts.

## STIPULATION OF FACTS

The building that is the subject of this lawsuit is a three-story residence located at 7228 South Coles Avenue in Chicago. HUD acquired title to the property in November 1974, after entry of a decree of foreclosure on the owner's mortgage. During the period of HUD's ownership the building was uninhabited, boarded up, and in a state of disrepair. The building had structural problems, including a cracked foundation, dilapidated porch and steps, unstable floors, and broken windows. It was infested with rodents and debris was scattered around the building. There was neither a night watchman on the premises nor a fence around the building, as required by sections 39–13 and 99–4.1 of the Municipal Code for the City of Chicago ("municipal code"). During the period of its ownership HUD expended $285.00 in repairs on the building. In addition, pursuant to an Area Management Broker Contract, it paid defendant Seward Rist ("Rist") $17.50 per month to oversee the building.

HUD's disposition policy with respect to one- to four-unit buildings at the time it acquired the building in question was to maximize sales on a "cash only, as-is, without warranty" basis. When, in August 1975, the late Mayor Richard J. Daley objected to this policy, HUD agreed to place a moratorium on such sales of HUD-owned Chicago property pending development of a

"Chicago Plan". Under the subsequently developed Chicago Plan, a purchaser of certain HUD-owned properties paid, in addition to the purchase price, $2,000.00 to be placed in an escrow fund and to be refunded to the purchaser upon certification by a City inspector that there were no major violations of the municipal code. The building in question was ultimately classified as eligible for disposition by this method.

HUD had a second property disposition program which operated in conjunction with the Chicago Plan. Under the Property Release Option Program ("PROP"), HUD would sell a qualifying building for $1.00 to the City and the City in turn would convey it to a not-for-profit organization for rehabilitation.

Shortly after HUD's acquisition of the property in question, Rist reported that it had a fair market value of $40,000.00. HUD then commissioned a repair specification study which indicated that, in March 1975, $17,389.00 in repairs would be necessary to bring the building into compliance with the municipal code. A study commissioned by the South Shore Senior Citizens Center in April 1976 indicated that it would cost $41,581.25 to rehabilitate the building. In May of 1976, Charles J. Shepard, of the City of Chicago Department of Urban Renewal, inspected the building and determined that it would cost $40,718.40 to bring the building into compliance with the occupancy requirements of the municipal code.

In March 1975 plaintiff Leo Burroughs wrote on behalf of plaintiff Five Block Club, an organization composed of individuals concerned with securing a safe, comfortable and healthy community environment and with advancing the community's interests, to defendant John Waner, Director of the Chicago Area Office of HUD, expressing concern over the deterioration of HUD-owned properties in the area. In April, seven members of the Five Block Club met with Waner and another HUD official to present them with a petition signed by 107 of the members of the Club and by defendant Rist, which requested immediate sale of the Coles property to a buyer who would rehabilitate the building. After this meeting HUD expended $40.00 to re-secure four windows in the building.

Shortly after the meeting Rist informed the Five Block Club, by letter, that the building was for sale and requested that members immediately report problems with the building to Rist or to the police. Copies of this letter were sent to Waner and defendant Stan Nykiel, a realty specialist in the Property Disposition Branch of the Housing Management Division of HUD's Chicago Area Office. Subsequently, several members communicated concern about the building to Rist. In June of 1975 defendant John Davis, Director of Property Disposition for HUD's Chicago Area Office, wrote to members of the Five Block Club expressing appreciation for their concern about the building.

In April of 1976 the City of Chicago requested that HUD keep the building off the real estate market for possible purchase by the City under PROP. Sometime in July, 1976, pursuant to PROP guidelines, HUD sold the building to the City for $1.00 and the City reconveyed it to the South Shore Senior Citizens Center for rehabilitation.

THE LITIGATION

Before HUD disposed of the building, the Five Block Club and eight of its members (Leo Burroughs, Jr., Esther Robinson, Donald Schatz, Earl Whatley, Steven Goldsmith, Anton Seals, Ishmael Seye, and Lizzie Mae Bonner) filed suit against defendants Rist, Waner, Nykiel, and Davis, as well as Carla Hills, then Secretary of HUD, Martin Rogan, Deputy Director of HUD's Chicago Area Office, and William Miller, Director of the Housing Management Division of HUD's Chicago Area Office. The complaint charged that these defendants had violated their duties under the National Housing Act ("NHA"), 12 U.S.C. § 1701 *et seq.*, and HUD regulations to maintain and repair HUD-owned properties. It also charged them with violations of Illinois statutes and Chicago's municipal code. The original complaint sought an injunction against these continuing violations of feder-

al, state, and local law. Plaintiffs also requested money damages for the hazards to their health, safety, and welfare allegedly resulting from the improper maintenance of the building.

■ .After HUD sold the building plaintiffs amended their complaint, deleting the request for injunctive relief. Defendants subsequently filed a motion to dismiss for failure to state a claim, and both plaintiffs and defendants moved for summary judgment. Judge Leighton denied all motions, concluding that plaintiffs had stated a claim under the NHA and HUD regulations, and that the existence of material factual issues as to the condition of the building precluded summary judgment. He did not reach the question whether federally-owned property is subject to state and local housing laws. *Burroughs, et al. v. Hills, et al.*, No. 76 C 1640 (N.D.Ill. October 11, 1978).[1]

## THE MOTIONS FOR SUMMARY JUDGMENT

### A. *Introduction*

The stipulation of facts submitted by the parties makes it abundantly clear that HUD owned a building in Chicago, as a result of foreclosure, for a 19-month period beginning in 1974 and continuing into 1976; that it contracted routine maintenance of the building to defendant Rist; and that the building, due to neglect and vandalism, substantially deteriorated during the period of HUD ownership. The building was then sold to a non-profit organization for reha-

bilitation. The parties have stipulated that the total damages recoverable, assuming liability, is $1,000.00 against the HUD defendants and $350.00 against Rist. This suit has survived the conveyance and subsequent rehabilitation of the property primarily as a vehicle to determine whether neighbors of blighted HUD-owned property have a cause of action for damages as a means of compelling HUD and its agents to act. Stripped to barest essentials, defendants' contentions are that federal law imposes no duties upon them enforceable at the behest of these plaintiffs and that they are not answerable under state and local law.

### B. *The Federal Claims*

The initial question presented by the cross-motions for summary judgment is whether plaintiffs have a right of action for damages under the applicable provisions of the NHA and the HUD regulations [2] developed thereunder. The parties [3] agree that there is no express provision for such an action by neighbors of HUD-owned property for failure to maintain that property and that the statute contains no other express enforcement mechanism. Plaintiffs must therefore rely on the theory of an implied private right of action in order to state a claim.

The court notes at the outset that both sides have engaged in a wide-ranging analysis of the legal principles governing private rights of action, standing, and even subject matter jurisdiction. Defendants have argued that plaintiffs do not satisfy

---

1. This court rejects plaintiffs' contention that Judge Leighton's earlier ruling that the complaint states a claim represents the law of the case, and the question of a private right of action thus may not be relitigated. In the first place, Judge Leighton did not expressly rule that plaintiffs had a private right of action. Secondly, even if he had, the district court is always free to reconsider prior rulings if it is convinced that its law of the case is substantially erroneous. *Diaz v. Indian Head, Inc.*, 686 F.2d 558 (7th Cir.1982).

2. The parties disagree as to the correct characterization of HUD's Property Disposition Handbook for One to Four Family Properties, No. 4310.5 (the "Handbook"). Plaintiffs character-

ize it as containing binding regulations placing mandatory duties on HUD personnel. Defendants, on the other hand, describe it as setting out internal policies and guidelines rather than enforceable duties. For the sake of convenience, the court will occasionally refer to the Handbook and its contents as the "HUD regulations".

3. The motion of defendant Rist, the area management broker, has a somewhat different focus. Rist argues that summary judgment must be granted in his favor because his duties are defined solely by his contract with HUD, not by federal law or HUD regulations, and any liability on his part runs only to the other contracting party, i.e., HUD.

the criteria for implication of a private right of action established in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1978), do not even meet the standing requirements of *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), *Data Processing Services v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), and do not fall within the limited waiver of sovereign immunity provided in the NHA, 12 U.S.C. § 1702. Plaintiffs, on the other hand, argue that the NHA and HUD regulations, which are couched in mandatory language, as well as the United States Housing Act, 42 U.S.C. § 1441 *et seq.,* impose enforceable duties on the HUD defendants and therefore require implication of a private right of action in their favor.

The passage of time has reduced this lawsuit to one for damages only. The issue at this stage of the proceedings is thus a much narrower one than the parties advocate: does the NHA create a cause of action in favor of neighbors of HUD-owned buildings to recover damages for the failure of HUD personnel to maintain such property?

Although the Supreme Court has said that "the question whether a litigant has a 'cause of action' [under a statute] is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive," *Davis v. Passman,* 442 U.S. 228, 239, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1978), most decisions have treated the two questions as interrelated and have not articulated the different considerations that might apply in deciding the availability of equitable as opposed to monetary relief under a given statute. Examination of the two "separate" questions has, for the most part, merged under a general analysis of the criteria for implying a private cause of action established in *Cort v. Ash, supra:* (1) whether plaintiff is a member of the class for whose especial benefit the statute was enacted;[4] (2) whether the history or language of the statute suggests an intent to create a private cause of action; (3) whether implication of a cause of action is consistent with the purposes and scheme of the statute; and (4) whether the cause of action is one traditionally relegated to state law.

The case law on implied private rights of action does, however, suggest that courts discriminate between the question of existence of a cause of action and existence of a particular remedy in two respects. First, the focus where damage actions are concerned tends to be on the third *Cort* factor. Second, there appears to be generally greater hesitancy to imply a cause of action for damages than one for equitable relief.

The Court of Appeals for the Seventh Circuit recently drew an explicit distinction between the questions of available remedies and the existence of a cause of action. In *Lieberman v. University of Chicago,* 660 F.2d 1185 (7th Cir.1981), *cert. denied,* 456 U.S. 937, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982), the court examined the availability of a damage remedy for persons subjected to sex discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). Although the Supreme Court in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), had previously implied a private right of action under Title IX, the Seventh Circuit did not consider that decision controlling on the question of available relief. Instead, relying on the above-quoted language in *Davis v. Passman, supra,* it con-

4. The Court elaborated on this first factor saying that the question is whether "the statute create[s] a federal right in favor of the plaintiff." 422 U.S. at 78, 95 S.Ct. at 2088. In *Universities Research Assn. v. Coutu,* 450 U.S. 754, 772, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981), the Court analyzed this factor in terms of whether the language of the statute in question has " 'an unmistakable focus on the benefited class' ... [or is] framed ... simply as a general prohibition or a command to a federal agency." (quoting *Cannon v. University of Chicago,* 441 U.S. 677, 690–91, 99 S.Ct. 1946, 1954–55, 60 L.Ed.2d 560). At least one court has viewed the language of the *Coutu* decision as a "refinement" of the first *Cort* factor. *Miener v. State of Mo.,* 673 F.2d 969, 974, n. 4 (8th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 215, 230, 74 L.Ed.2d 171 (1982).

cluded that the question of remedies must be considered separate and apart from the issue of a private cause of action. Focusing on the purpose of the statute in question, it concluded that a damage remedy was not consistent with its purposes and would not further its goals.[5]

Other courts have been reluctant to extend an implied private right of action to include monetary relief. In *Ruth Anne M. v. Alvin Independent School Dist.*, 532 F.Supp. 460 (S.D.Tex.1982), the court considered the existence of an implied private right of action for damages under the Rehabilitation Act of 1973, 29 U.S.C. § 794. Based on the legislative history of the Act and the fact that it creates substantive rights in favor of the handicapped, the court concluded that such persons have a private right of action to enforce the Act. However, after considering the statute, its legislative history, and the statutory objectives, the court found that "Congress, although intending a judicial remedy to enforce rights conferred by [the Act], intended generally to provide for enforcement of those rights only through injunctive and declaratory relief." 532 F.Supp. at 471. It rested its decision in part on the adequacy of equitable relief to protect the rights of the handicapped and the fact that a damage remedy, in potentially imposing massive financial liability upon recipients of federal funds, might deter acceptance of such funds and thus impede the legislative goal of expanding opportunities for the handicapped. In reaching this conclusion, the court expressly rejected the approach taken in *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), that where a statute creates substantive rights courts should presume

the full panoply of traditional remedies. It said, "[t]hat principle seems unavoidably suspect in view of recent Supreme Court decisions considering the implication of private remedies and the element of congressional intent." *Id.* (citing *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) and *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)).

In *Boxall v. Sequoia U. High Sch. Dist.*, 464 F.Supp. 1104 (N.D.Cal.1979), the court, although finding an implied private right of action to enforce the provisions of the Rehabilitation Act, also declined to give beneficiaries of the Act a damage remedy. It concluded that such actions should be limited to equitable relief, finding that, because the statute did not purport "to give individuals a whole panoply of new rights and remedies," it "should probably be seen as creating a private supplement to governmental enforcement, not as providing a new entitlement to damages." *Id.* at 1112.

In *Loughran v. Flanders,* 470 F.Supp. 110 (D.Conn.1979), the court, though it did not explicitly distinguish between the remedy and cause of action issues, counseled special hesitation in implying a damage remedy, focusing on the purpose of the statute at issue. Although the plaintiff in *Loughran* was a special beneficiary of the Education for All Handicapped Children Act, 20 U.S.C. § 1401 *et seq.*, and indeed, had an express private right of action under the statute, the court declined to imply a damages remedy because the statutory purposes of providing federal assistance for education of the handicapped and serving as a catalyst for educational innovation would not be furthered by such a remedy. *Id.* at 115.[6]

---

**5.** In *Guardians Ass'n of New York City v. Civil Serv.,* 633 F.2d 232 (2d Cir.1980), *cert. granted,* 454 U.S. 1140, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982), a majority of the court reached a different result concerning the availability of damages under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, the statute after which Title IX was modeled. The court felt that *Cannon,* which it characterized as implying a "private right of action unlimited as to remedy," 633 F.2d at 273, compelled this result. Judge Meskill, who disagreed with the majority view, examined the question of a damage reme-

dy in light of the four *Cort* factors and concluded, primarily in light of the purposes of Title VI, that such a remedy was not available. *Id.* at 255.

**6.** In *Anderson v. Thompson,* 658 F.2d 1205, 1210 n. 7 (7th Cir.1981), the court concluded that the *Cort v. Ash* four-step analysis was inappropriate when the question is availability of remedies rather than existence of a cause of action, especially where the statute involved expressly provides for a right of action but is silent as to relief. It nonetheless examined the

Keeping in mind the generally greater hesitancy of the courts, and particularly the Court of Appeals for the Seventh Circuit, to imply a damage remedy in a statute that does not expressly provide for one, the court turns now to the statute in question.

In insuring and eventually acquiring the property in question, HUD was acting pursuant to the NHA, more specifically, the mortgage insurance provisions of the NHA, 12 U.S.C. § 1707 *et seq.* The policies and goals of the subchapter on mortgage insurance as well as other federal housing legislation are enunciated in 42 U.S.C. §§ 1441 and 1441a, and reaffirmed in 12 U.S.C. § 1701t. Section 1441 states:

> The Congress declares that the general welfare and security of the Nation and the health and living standards of its people require housing production and related community development sufficient to remedy the serious housing shortage, the elimination of substandard and other inadequate housing through the clearance of slums and other blighted areas, and the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family . . . .

Section 1441a states in relevant part:

> (b) The Congress further finds that policies designed to contribute to the achievement of the national housing goal *have not directed sufficient attention and resources to the preservation of existing housing and neighborhoods,* that the deterioration and abandonment of housing for the Nation's lower income families has accelerated over the last decade, and that this acceleration has contributed to neighborhood disintegration and has partially negated the progress toward achieving the national housing goal which has been made primarily through new housing construction.
>
> (c) The Congress declares that if the national housing goal is to be achieved, *a greater effort must be made to encour-age the preservation of existing housing and neighborhoods through such measures as housing preservation, moderate rehabilitation, and improvements in housing management and maintenance,* in conjunction with the provision of adequate municipal services. Such an effort should concentrate, to a greater extent than it has in the past, on housing and neighborhoods where deterioration is evident but has not yet become acute (emphasis supplied).

Section 1701t reiterates the goal of "a decent home and a suitable living environment for every American family" and further states:

> The Congress declares that in the administration of those housing programs authorized by this Act which are designed to assist families with incomes so low that they could not otherwise decently house themselves, and of other Government programs designed to assist in the provision of housing for such families, the highest priority and emphasis should be given to meeting the housing needs of those families for which the national goal has not become a reality . . . .

The above-quoted statement of purposes makes it clear that Congress, in passing the NHA, intended primarily to benefit low income persons in need of adequate housing. However, they are not the sole beneficiaries of the statute. Federal housing legislation also evidences a concern for the development and maintenance of "stable, desirable urban communities." *Alschuler v. Dept. of Housing & Urban Development,* 686 F.2d 472, 478 (7th Cir.1982).

The goal of aiding in the preservation of existing housing and urban communities and the resulting benefit to residents of neighborhoods where the federal government invests its funds are even more apparent in the particular statutory provisions and administrative guidelines under which HUD acquired and handled the property in question. HUD acquired the building pur-

---

availability of a damages remedy under the statute in question there in light of the statute's language, legislative history and purposes.

These are the first three factors outlined in *Cort.*

suant to 12 U.S.C. § 1710, which provides for conveyance to HUD upon foreclosure, of mortgaged properties which are federally insured under 12 U.S.C. § 1709. Section 1710(g) grants the Secretary of HUD the power to "deal with, complete, rent, renovate, modernize, insure, or sell for cash or credit, in his discretion, any properties conveyed to him. . . ."

■ HUD promulgated guidelines for the maintenance and disposition of properties acquired through mortgage foreclosure.[7] Those guidelines indicate that the NHA was intended at least in part to ensure the preservation of existing housing and the protection of residents of neighborhoods receiving federal housing monies. Paragraph 23 of the Handbook requires that all properties "*shall be* fully repaired promptly" (emphasis supplied), and notes that "[t]he timely provision of repair or substantial rehabilitation may be critical to the preservation of block [sic] and even neighborhoods in older areas of our cities and suburbs." Paragraph 23g imposes on HUD the duty to give immediate attention "to those repairs required to prevent undue deterioration and eliminate hazardous conditions that may be dangerous to the public." Paragraph 70 of the Handbook states that "[e]very possible precaution shall be taken to eliminate conditions which may contribute to injury or damage to the person or property of others, particularly those conditions which may be attributed to negligence." Paragraph 104 reiterates this concern, stating, "Immediate action must be taken to eliminate any conditions hazardous to the public. . . ."

■ The court concludes that the statement of purposes in the NHA and the above-quoted language in the HUD regulations place plaintiffs within those classes of

persons which the NHA seeks to benefit. The court further concludes that the NHA and the HUD Handbook impose upon HUD the duty to maintain properties it acquires through foreclosure.

■ First, this circuit has read the NHA as imposing a duty upon HUD to act consistently with national housing policies. *United States v. Winthrop Towers,* 628 F.2d 1028, 1034–35 (7th Cir.1980). (HUD decision to foreclose mortgage subject to review under the Administrative Procedure Act for conformity to national housing objectives). *See also Commonwealth of Pennsylvania v. Lynn,* 501 F.2d 848, 855 (D.C.Cir.1974). One of those policies or goals is the preservation of existing housing and neighborhoods. Second, HUD's own internal guidelines make mandatory HUD's maintenance and repair of buildings it acquires through mortgage foreclosure. The HUD defendants' argument that the Handbook is not binding on them because it was not published in accordance with statutory rule-making procedures is not well taken. *Brown v. Lynn,* 392 F.Supp. 559 (N.D.Ill.1975), on which they rely, involved an attempt to impose upon third parties the duties set forth in an unpublished HUD handbook. Here, plaintiffs seek to hold HUD itself to the standards it has established. *See Estrada v. Hills,* 401 F.Supp. 429, 437–38 (N.D.Ill. 1975).

■ The question in this case, however, is not whether plaintiffs have standing to bring an action for judicial review of HUD's conduct under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,* or even whether they can enforce HUD's duties by obtaining an injunction against the responsible officials directly under the

7. As noted *supra* at fn. 2, the parties disagree as to the enforceability of the duties set forth in the Handbook. The HUD defendants, citing *Brown v. Lynn,* 392 F.Supp. 559 (N.D.Ill.1975), argue that the "guidelines" contained therein do not constitute binding regulations because there was no compliance with the requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b). Plaintiffs, relying on *Estrada v. Hills,* 401 F.Supp. 429 (N.D.Ill.1975), contend that the Handbook imposes mandatory duties on HUD

officials. At this point the court examines the contents of the Handbook solely for the purpose of gleaning evidence of legislative intent to benefit a particular class of potential litigants. While statements of policy contained in agency regulations or guidelines would alone be insufficient to infer a private cause of action, they are relevant to the extent that they support congressional intent as expressed in the language or history of the statute.

NHA. Rather, the issue here is whether the foregoing evidence of congressional intent to confer a benefit upon the class of individuals to which plaintiffs belong and the mandatory nature of HUD's duties support implication of a private right of action for damages by these plaintiffs. The court concludes that they do not for essentially two reasons.

First, plaintiffs are not the sole or even primary beneficiaries of the NHA in general or the specific statutory provisions at issue here. There can be no question, and plaintiffs do not dispute, that potential inhabitants of federally-funded or supported housing are the primary beneficiaries of federal housing legislation. In addition, there are other classes of potential plaintiffs who share secondarily in the benefits of the statutes in question. For example, the NHA contains numerous incentives for the involvement of private developers in housing construction, and Congress has expressed an interest in such participation as one of the goals of the housing statutes. 42 U.S.C. § 1441. *See Shivers v. Landrieu,* 674 F.2d 906, 911 (D.C.Cir.1981) (tenants of federally-insured housing have no private right of action for damages under mortgage insurance provisions of the NHA for deficient building maintenance because "[t]hey are not, however, the Act's only beneficiaries—obviously the benefit of mortgage insurance operates directly in favor of the bankers, builders, and developers.")

The government itself is an intended beneficiary of various provisions of the NHA. For example, HUD's authority to set rents on federally-insured buildings under § 221(d)(3) of the NHA, 12 U.S.C. § 1715*l* (d)(3), while clearly aiding low income tenants, also "attempts to assure adequate return sufficient to prevent foreclosure," thereby benefitting the government, which "will bear the brunt should there be a default." *Falzarano v. United States,* 607 F.2d 506, 510 (1st Cir.1979) (tenants of federally-insured housing have no private right of action for violations of § 221(d)(3)). And HUD's duty under § 221(d)(2), 12 U.S.C. § 1715*l*(d)(2), to insure mortgages only on property that conforms to local

ordinances redounds to the benefit of the government because it "assure[s] the United States of adequate security for the mortgages FHA insure[s]." *Davis v. Romney,* 490 F.2d 1360, 1372 (3d Cir.1974) (purchasers of homes with federally-insured mortgages may maintain an action under the Administrative Procedure Act for declaratory and injunctive relief but have no private right of action for damages when HUD violates § 221(d)(2)).

In the present case, HUD's authority, under § 204(g) of the NHA, 12 U.S.C. § 1710(g), to deal with property acquired through foreclosure protects the government's financial interests as well as the interests of potential purchasers. The Forward to the HUD Handbook notes that it is "designed to assist in the disposal of properties as promptly as possible. The prompt and orderly disposition of properties is absolutely essential to the continuous cash flow to the treasury resulting from sales proceeds." Paragraph 23e of the Handbook states that the policy of complete and adequate repair "protects HUD and it also protects the purchasers." In the chapter titled "Repairs and Maintenance," the Handbook provides at ¶ 185,

> a. *The overall objective* is to (a) place properties in first class condition to create maximum sales appeal at the highest obtainable sales price in order to contribute to maintenance of a firm real estate market; (b) eliminate potential default hazard attributable to physical deficiencies and (c) eliminate all structural, (including termite infestation) mechanical and surface deficiencies which, if not eliminated, would result in major repair or replacement expenditures by the purchaser, or demand upon HUD under the terms of the warranty on the Sales Contract, Form 2384.

Thus, any maintenance and repair responsibilities imposed upon HUD by the NHA and the HUD Handbook benefit not only neighbors of HUD-owned properties, but also purchasers of such properties and the government itself. The fact that damages, if available, would ultimately come from

the pocket of a beneficiary of the very statute and regulations under which plaintiffs sue militates against implying a damage remedy.

The second and more significant reason for declining to infer from the NHA a damage remedy on behalf of plaintiffs is that such relief would be at cross purposes with the fundamental objectives of the statute and other housing legislation. "The primary purpose of the legislative scheme is to upgrade the nation's housing." *Cedar-Riverside Assoc. v. City of Minneapolis,* 606 F.2d 254, 258 (8th Cir.1979). This is to be accomplished through a variety of mechanisms, including rental subsidies for new or rehabilitated housing, mortgage insurance, and federal funding for urban redevelopment. To grant neighborhood residents a damage remedy for injuries resulting from their proximity to hazardous conditions on HUD-owned property would just divert funds from the provision of adequate housing. The payment of money to nearby residents does not paint a porch or glaze a window; it does not in any respect preserve a neighborhood. At most it provides some balm to some undefined and virtually undefinable class of people for continuing co-existence with substandard housing. Furthermore, an award of compensation for plaintiffs' alleged injuries, as opposed to enforcement through injunctive relief or judicial review under the Administrative Procedure Act, would not even necessarily deter future derelictions of duty by HUD officials. *See Jones v. Reagan,* 696 F.2d 551 at 554 (7th Cir.1983) (discussing "make whole" and deterrent functions of compensatory and punitive damage awards). Under these circumstances, implication of a private right of action for damages under the NHA is ill-advised. *See Shivers v. Landrieu,* 674 F.2d at 912 (granting tenants of federally-insured housing a damages remedy might *"impede,* rather than promote the construction of housing units (emphasis in original)).

Upon reviewing the statute in question, the court concludes that while plaintiffs are within one of several classes of potential litigants protected and benefitted by the NHA and thus may enforce the duties imposed by the statute, a damages remedy is not contemplated by or consistent with the purposes of the NHA. Summary judgment must therefore be granted in defendants' favor with respect to the federal claims.[8]

C. *The State Law Claims*

■ Normally a party's state law claims, brought pursuant to the court's pendent jurisdiction, should be dismissed if his federal claims are rejected prior to trial. *United Mineworkers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Abiodun v. Martin Oil Service, Inc.,* 475 F.2d 142, 145, (7th Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 57, 38 L.Ed.2d 86 (1973). However, under certain circumstances "judicial economy, convenience, and fairness to the litigants' favor the retention of jurisdiction over state law issues . . . ." *Forest Laboratories, Inc. v. Pillsbury Company,* 452 F.2d 621, 629, (7th Cir.1971) (quoting *United Mineworkers, supra*). Upon weighing these factors the court concludes that plaintiffs' state claims should be resolved here.

First, the parties have filed cross-motions for summary judgment. The case is therefore in the same procedural posture as one in which the parties have gone to trial; discovery is complete and all the evidence has been presented. Second, this case has been pending in federal court since 1976; if the state claims were dismissed for lack of jurisdiction and plaintiffs forced to re-file their suit in state court, they might well be confronted with statute of limitations problems. Third, assuming plaintiffs were able to bring an action in state court, the federal defendants would be entitled to remove the action to federal court pursuant to 28 U.S.C. § 1442(a)(1), and in all likelihood would do so. For these reasons the court will, in its discretion, exercise jurisdiction over plaintiffs' state law claims.

---

**8.** Although Rist, the only non-government defendant in this case, does not challenge plaintiffs' federal claims on implied private right-of action grounds, the foregoing analysis applies as well with respect to the federal claims against him. .

In Counts II and III of their complaint, plaintiffs have alleged that defendants violated state and municipal law in failing to have a night watchman on the premises, in maintaining the building in a manner constituting a nuisance, in failing to erect an eight-foot fence around the building, and in permitting the building to be boarded up. Defendants concede these facts, but argue, nonetheless, that they are not liable for these violations of local law. The HUD defendants contend that they are free from state regulation under the supremacy clause of the United States Constitution, that they are absolutely immune from liability for what are in essence common law torts, and, alternatively, that they are entitled to a good faith defense under the stipulated facts. Defendant Rist contends that, because state law permits only injunctive relief for violations of municipal ordinances, plaintiffs have no cause of action for damages.

■■■ The court rejects the general proposition that the supremacy clause completely relieves federal officials of susceptibility to suit for violations of state law. Rather, when an agency of the federal government insinuates itself into the local business world, as HUD does here under the mortgage insurance and foreclosure provisions of the NHA, it should, as a general rule, be held to the same legal obligations as a private property owner. *Cf. F.H.A. v. Burr,* 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940) (construing NHA waiver of sovereign immunity provisions and holding that "when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued,' that agency is not less amenable to judicial process than a private enterprise under like circumstances would be. . . ."); *City of Philadelphia v. Page,* 363 F.Supp. 148, 153 (E.D.Pa.1973) (holding HUD liable over to purchaser of HUD property which

violated local ordinances: "When the government goes into the marketplace it must go as everyone else" (citation omitted)). This court agrees with the view taken in *City-Wide Coalition, Etc. v. Philadelphia Hous. Auth.,* 356 F.Supp. 123, 129 (E.D. Pa.1973), where the court held that Congress had not granted HUD the right to preempt or disregard reasonable local health regulations concerning properties which it acquires. *See also Knox Hill Tenant Council v. Washington,* 448 F.2d 1045, 1055 (D.C.Cir.1971) (no evidence of congressional intent to exempt government-owned housing from local housing codes).[9]

The court's view that HUD-owned property is subject to local housing codes is buttressed by HUD's own regulations with regard to the property in question. The HUD Handbook states at ¶ 185(d), "[I]n areas where local housing codes are in effect and are being actively enforced, the repair program is to be designed to meet local code requirements." Thus, neither the NHA nor HUD's own guidelines support the HUD defendants' preemption argument. *Cf. City of Boston v. Harris,* 619 F.2d 87, 95 n. 21 (1st Cir.1980) (administrative preemption of local law in absence of explicit congressional declaration of preemption valid where Congress delegates to agency broad administrative powers).

■■ The court recognizes that even where there is no express preemption provision in a federal statute, federal preemption may be warranted when there is a clear conflict between federal and local law. *See Chicago-Midwest Meat Ass'n v. City of Evanston,* 589 F.2d 278, 282 (7th Cir.1978), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979), and cases cited therein. However, the state and local law in question here does not conflict with the purposes of the NHA. As discussed above, the NHA, along with other federal housing leg-

9. The only case in this circuit dealing with HUD's liability under local law is *Merrill Tenant Council v. U.S. Dept. of Housing,* 638 F.2d 1086 (7th Cir.1981), where the court held that HUD was obligated to pay interest on security deposits received from tenants of HUD-owned or operated property, as required by Illinois law. *Id.* at 1089. The *Merrill* court did not expressly decide the preemption question, rather simply assuming that Illinois law applied to the federal defendants.

islation, was enacted to aid in the provision of safe and decent housing to the nation's lower income families through the construction of new housing and the rehabilitation of existing structures. Municipal code provisions which require a night watchman on the premises of vacant buildings to protect against vandalism and which prohibit operation of a building as a nuisance complement rather than hinder these federal goals.[10] Similarly, the Illinois statutory provision which permits a municipality to demolish or repair "dangerous and unsafe buildings or uncompleted and abandoned buildings," Ill.Rev.Stat., ch. 24, § 11–31–1 (1979), has a purpose which parallels the goals of federal housing legislation. It was intended to provide municipalities with "an effective tool for protecting its citizens from the unfortunate and degrading results of substandard and dangerous housing." *City of Chicago v. Nielsen,* 38 Ill.App.3d 941, 349 N.E.2d 532, 537 (1st Dist.1976).

Defendants argue that requiring compliance with these ordinances would be exceedingly burdensome financially and would frustrate national housing goals because it would, in effect, encourage demolition of buildings acquired by HUD through mortgage foreclosure. Such an argument is unpersuasive. It is highly unlikely that HUD would choose to incur the expense of demolishing its buildings and, in addition, lose the value of such buildings as a result of demolition in order to avoid complying with local law. Moreover, this argument could be used to avoid liability under any state or local law that requires some expenditure of federal monies. The court does not believe

that the "clear conflict" doctrine of the supremacy clause was intended to reach so far.

The federal defendants' remaining arguments that they have absolute immunity or at least a good faith defense with respect to the state law claims involve complicated factual questions concerning the scope of their official functions and their specific duties as HUD employees, and are in the nature of affirmative defenses. In light of the court's determination that, under Illinois law, plaintiffs have not stated a claim entitling them to monetary relief against the federal or private defendants, these questions need not be decided.

■ Plaintiffs brought their state law claims pursuant to Ill.Rev.Stat. ch. 24, § 11–13–15, which provided in relevant part:

> ... any owner or tenant of real property within 500 feet in any direction of the property on which the building or structure in question is located who shows that his property or person will be substantially affected by the alleged violation [of ordinances enacted pursuant to certain divisions of the Illinois Municipal Code], in addition to other remedies, may institute any appropriate action or proceeding ... (3) to prevent any illegal act, conduct, business, or use in or about the premises, or (4) to restrain, correct or abate the violation.[11]

The statute by its terms creates a limited right of action on behalf of certain private parties to enforce municipal ordinances by way of an injunction.[12] Contrary to plain-

---

10. The purpose of § 99–4.1 of the municipal code, which requires that property used "for the purpose of storing used lumber, metal, or other second-hand building material" be surrounded by an eight-foot fence and its applicability to the building in question is less clear. Most likely, it was intended to protect the public from the dangers attendant upon the storage of such materials. However, in light of the resolution of plaintiffs' state law claims, the court need not determine the purpose of this ordinance. The court also wonders, in passing, whether strict enforcement of the night watchman ordinance against HUD might give it some species of equal protection or selective prose-

cution argument. On the other hand, strict enforcement of the ordinance generally would go far toward fulfillment, in Chicago at least, of the dictates of the Humphrey-Hawkins Act.

11. The statute was amended in 1977 to permit tenants or owners within 1200 feet to bring suit.

12. Section 11–13–15 provides for enforcement of municipal ordinances. Count III of plaintiffs' complaint alleges a violation of a state statute not a municipal ordinance. Moreover, the statute in question, Ill.Rev.Stat. ch. 24, § 11–31–1 (1981) grants to the corporate au-

tiffs' contention, the statutory language referring to other available remedies does not create statutory remedies in addition to injunctive relief. Rather, it simply makes clear that the § 11–13–15 does not preclude other remedies or rights of action available under other statutes or the common law.[13] Plaintiffs' suit for injunctive relief has been mooted by the sale of the building and § 11–13–15 provides no other remedy to private parties in connection with violations of city ordinances. Plaintiffs, obviously because of the restrictions upon private actions challenging public nuisances, in their briefs expressly disavow that their state law claims for damages are in the nature of a common law nuisance action, stating, "No part of plaintiffs' complaint even purports to allege the elements of such a tort." (Plaintiffs' Reply Memorandum, p. 14). Accordingly, defendants' motion for summary judgment respecting the state law claims must also be granted.

thorities of each municipality the right to demolish or repair certain buildings. Although the parties do not argue the point, it does not appear that § 11–13–15 grants plaintiffs the right to enforce state statutes.

13. This view is supported by the fact that the statute specifically refers only to the court's power to issue restraining orders and preliminary and permanent injunctions, and mentions no other remedies.