Leo BURROUGHS, Jr., et al., Plaintiffs-Appellants, Cross-Appellees,

v.

Carla HILLS, Secretary, Department of Housing and Urban Development, et al., Defendants-Appellees, Cross-Appellants.

No. 83–1604, 83–2289.

United States Court of Appeals, Seventh Circuit.

Argued April 11, 1984.

Decided Aug. 15, 1984.

Rehearing and Rehearing En Banc Denied Oct. 22, 1984.

Thomas J. McCarthy, Jenner & Block, Chicago, Ill., for plaintiffs-appellants, cross-appellees.

Margaret C. Gordon, Asst. U.S. Atty., Chicago, Ill., for defendants-appellees, cross-appellants.

Before POSNER and FLAUM, Circuit Judges, and NICHOLS,* Senior Circuit Judge.

PER CURIAM.

The court is unanimously of the opinion that the decision of District Judge Moran on summary judgment dismissing the petition, ought to be affirmed, and judgment is entered to that effect. The court is also unanimously of the opinion that the decision of the same district judge, denying costs to the prevailing parties, ought to be reversed, and judgment is entered to that effect. The judges of this panel differ somewhat in stating their reasons and, therefore, the views of each judge are separately appended. However, Judge Posner joins in Judge Nichols' opinion except Part IV B, and except for that part, it may therefore be taken as the opinion of the court. Affirmed in No. 83–1604 and reversed in No. 83–2289.

NICHOLS, Senior Circuit Judge.

This action was brought in the Northern District of Illinois by eight individuals and a voluntary community organization, against former Housing and Urban Development (HUD) Secretary Carla Hills, various regional and local HUD officials, and Seward Rist, Area Management Broker. Hills is no longer Secretary, but successors have not been formally substituted as parties. Plaintiffs originally sought injunctive relief but now seek money damages only, on account of injury they allege they suffered as nearby residents because defendants allowed certain Chicago residential property acquired by foreclosure to be vacant and a hazard to health and safety of community residents from acquisition, November 1974, through disposal, July 19, 1976, all contrary to Federal law, state law,

---

* The Honorable Philip Nichols, Jr., of the United States Court of Appeals for the Federal Circuit, is sitting by designation.

municipal ordinance, and in Mr. Rist's case, his contract. A motion to dismiss was early denied, but this holding is passed over here because not assigned as error in any party's appeal. The injunctive relief issue has been considered mooted since the disposal of the property shortly after the suit was filed.

On March 8 and 10, 1983, District Judge Moran, having before him cross-motions for summary judgment and a fact stipulation signed by all the parties, granted defendant's motion and dismissed the petition, but denied the defendants their costs. *Burroughs v. Hills*, 564 F.Supp. 1007 (N.D. Ill.1983). This appeal followed and there is a cross-appeal relating to costs only.

## I

### *Facts*

The stipulated facts represent a somewhat unhappy situation from the Federal taxpayer's point of view. The case is said to be representative of others, and a test. The property in question is a three-story residential structure at 7228 S. Coles Avenue in Chicago. Becoming titleholder by foreclosure, HUD allowed the building to be unoccupied and unguarded, with no watchman on duty, and unfenced. Glass was broken throughout, rats, mice, other rodents and insects were present, foundations were cracked, exterior walls needed tuckpointing, floors were unstable, exterior doors were unsecured, the front steps and back porch were in disrepair, debris was scattered around the building, including rubble, refuse, and lumber material "knocked down by vandals" for whom the building was "a frequent target." Mr. Rist as contract "area management broker" (AMB) inspected seven times and reported the building was secured, the windows boarded, the grass cut, and the lot free of debris. (Evidently the parties mean to imply that Mr. Rist reported falsely.) Mr. Rist had the management of 150–200 government-owned buildings and so far as appears is the only defendant who actually saw this property, but the official defendants had independent means of knowing what was occurring so far as they were aware of plaintiffs' complaints.

HUD originally considered the property had a fair market value of $40,000, less needed repairs at $17,389, making it available at $22,600. Some $285 was spent on maintenance pursuant to Mr. Rist's invoices. HUD paid all the taxes. On July 19, 1976, HUD sold the property to the city for $1, which could, under the applicable program, be done only if the appraised value was under $5,000. Chicago conveyed it to the South Shore Senior Citizens Association, which was stipulated to be proceeding with repairs estimated to cost over $40,000, to be financed by HUD by "block grant." Thus the stipulated facts indicate a precipitate decline in market value during the period of HUD ownership, and we assume that this occurred, with an increase in the repairs needed.

Plaintiffs are eight individuals who resided as tenants within 500 feet of this derelict property, plus the Five Block Club, a voluntary organization formed for the purpose of combating neighborhood blight. The interest of the individual plaintiffs was their concern for the health and safety of themselves and their families. They feared increased crime and drug activity because the building was "a likely hideout for criminals and gangs." They routinely passed the immediate area and saw the building each day. None of them claim to own any real property in the neighborhood.

We note that dwelling within 500 feet of such an offending structure is a fact that confers special status under Illinois law, whether one is owner or tenant. If his property *or person* are "substantially affected" by an alleged violation, in addition to other remedies, he may sue for injunction, without having to "prove any special or unique damage to himself or his property from the alleged violation." Chapter 24, paragraph 11–13–15 of Illinois Revised Statutes, as amended and in effect when the complaint was filed.

Plaintiff Burroughs first complained to defendant Waner on March 19, 1975, and

on April 2 the Five Block Club presented Waner with petitions signed by 107 members, one of whom oddly enough was defendant Rist. At that time they urged immediate sale to a buyer who would rehabilitate. They frequently communicated afterwards to Mr. Rist, but it is stipulated that the official defendants obtained no more information as to the bad condition of the building until the suit was filed. The stipulation describes their duties, from which we are perhaps expected to infer that it was their duty to know. Mr. Rist was a party to a contract with the government by which he was to perform, as to properties to which HUD acquired title, various services including inspection, and taking the necessary steps when repairs were found necessary.

The stipulation closes with a curious provision that if the official defendants are liable, they are liable jointly and severally in the amount of $1,000, and if Rist is liable, it is in the amount of $350. The stipulation is silent, and we are not informed what liability might be asserted in companion cases, if any, should what we here hold suggest such liabilities and what we say treated as *stare decisis*.

## II

### Theory of the Action

Defendant Hills and the other official defendants are held by plaintiffs to be liable in their official capacities under Federal law. The official defendants, except Hills, are said to be liable in their individual capacities also under Federal law. Mr. Rist is liable under his contract with HUD, and under state and local law, they contend.

The district judge also dealt with what he considered to be pendent jurisdiction claims under the doctrine of *United Mineworkers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). He pointed out that under the state law relied on, injunctive relief only is provided and he denied damages on that ground. Plaintiffs do not

argue any reason why this is erroneous. This, however, does not preclude consideration of local law because in HUD operations, as we will point out, Federal law requires property management in conformity to local law, and thus if a breach of state law occurs, it may *ipso facto* be a breach of duties under Federal law, and it may not be necessary for the court to rely on pendent jurisdiction. HUD properties do not become like some Federal properties, enclaves exempt from local law. *Merrill Tenant Council v. HUD*, 638 F.2d 1086 (7th Cir.1981).

Plaintiffs admit that the National Housing Act, 12 U.S.C. § 1701 and ff is the authority under which the United States insured and then foreclosed the mortgage on the involved property, becoming owner of record, and under which the Federal defendants acted. 12 U.S.C. §§ 1713(k), 1710(g). They also admit that the act contains no language expressly authorizing suits against the Secretary of HUD, or any of her subordinates, to enforce official or personal liability for not executing the granted powers in a proper manner. The theory of the action, in its most basic form therefore, is that the litigation rights asserted herein are among those which can be held to have been implied by the legislative scheme, according to the standards stated in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) or in the progeny of that case.

Insofar as the suit is against the defendant officers in their official capacities, it is understood by the parties and held by the district judge, that the Secretary may sue and be sued in her official capacity by 12 U.S.C. § 1702 which, as a practical matter, means that the "Mortgage Insurance Fund," or possibly other government funds, may be used to pay judgments and that issues of sovereign immunity and consent to be sued are eliminated. *Merrill Tenant Council v. HUD, supra* at 1091. But section 1702 does not of its own force create a private cause of action. *Shivers v. Landrieu*, 674 F.2d 906, 911 n. 21 (D.C.Cir. 1981). It would seem that so far as official

funds are concerned, naming the Secretary as a defendant suffices and other officials need not have been joined.

The pleadings, the stipulations, and pronouncements of counsel make it clear, however, that personal damages recoverable from individual officials are also sought. Originally this is on a tort theory. Evidently this mulcting of personal rather than official funds would make some changes in application of the *Cort v. Ash* factors: the detriment to other beneficiaries of the program by depletion of available housing funds would be eliminated, but on the other hand, there would be created a disincentive to anyone accepting appointment as a HUD official. These differences between the two kinds of relief sought are surprisingly little discussed by the parties, and the district judge seems to disregard the possibility that the official defendants, except Hills, may be personally liable.

The theory of Mr. Rist's liability is necessarily a little different. He contracted to do things for HUD which, had he done them, would have lessened or eliminated any detriment to the plaintiffs. They presumably sue him as third-party beneficiaries under his contract. *Cf. Merrill Tenant Council v. HUD, supra* at 1093. This may eliminate *Cort v. Ash* as controlling authority in his case, but if they are to show that they were intended contract beneficiaries, they must have to make a showing that in effect he was working for them.

The supposed pendent state law claims are really claims that the policy of the Housing Act, 12 U.S.C. § 1701 and ff, requires that when HUD becomes owner of real property located within sovereign states, acting under the General Welfare clause and not under specific Federal constitutional grants of power, HUD must conform to construction codes, etc., of local law just as the previous but now foreclosed mortgagors had to do. The existence of such a policy of law is not in dispute and is illustrated by quotes from HUD documents which need not be detailed. For example, Mr. Rist's contract required him to prepare local tax returns and see that HUD was duly advised of tax liabilities. It is therefore plain that plaintiffs can, as they do, buttress their Federal claims by references to breaches of local law.

## III

### *Statutes, Regulatory Provisions, and Contract Provisions Relied On*

These are placed in Appendix A and are given verbatim as plaintiffs quote them in their brief.

■ The HUD Handbook is quoted and relied on by plaintiffs as a government regulation. It appears on its face to be intended for internal use for the information and guidance of HUD officials. Such handbooks are usual in the Executive Branch of the United States Government. Uncertainty often exists whether a handbook is meant to be, or is inadvertently made to be, an independent source of legal rights or claims against the United States Government and its officials. See treatment of this problem in *Fiorentino v. United States*, 607 F.2d 963 (Ct.Cl.1979), *cert. denied*, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980). *See also Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1439 (Fed.Cir.1984), which says of the *Manual of Patent Office Examining Procedure*, "[t]he MPEP has no binding force on us, but is entitled to notice so far as it is an official interpretation of statutes or regulations with which it is not in conflict." That is the weight we give the HUD Handbook here. Mr. Rist's contract is on a standard government form for Area Brokers.

## IV

### *Discussion*

A. *The principal appeal.*

In view of the very conspicuous inability of the plaintiffs to cite any statute granting them expressly a right to sue in the Federal courts on account of the kind of inadequate performance by HUD officials described in the stipulation, or by their contractors, it is necessary for them to

show that Congress granted them by implication a right to sue under a *Cort v. Ash* analysis. They undertook to make such a showing to the district court and partly persuaded it. Judge Moran held, to summarize briefly his carefully reasoned analysis, that a breach of duty owed towards these plaintiffs clearly occurred, but to enforce it by money damages in his court would be counter-productive because it would "ultimately come from the pocket of a beneficiary" meaning apparently that payment would deplete the Mortgage Insurance Fund and that it would provide "some balm to some undefined and virtually undefinable class of people for continuing coexistence with substandard housing" but not even necessarily deter future derelictions of duty by HUD officials; the theory here again being that funds would be diverted to give balm to aggrieved individuals rather than being used to bring housing up to standard. Here again there seems to be the unspoken assumption that the HUD defendants are sued only in their official capacities and will not be required to make plaintiffs whole out of their own pockets. The stipulation does not say this and we fail to see where it so implies. It says all named defendants are "obligated" to pay the sums stated. The official group are "jointly and severally obligated." If public funds were to be used, it would have sufficed to say that the Secretary was "obligated." Moreover, the class of possible claimants is not all that open-ended. They were not certified as a class, but they defined themselves as persons dwelling within 500 feet of the offending structure. This is treated as a distinct category under local law, conferring standing to enforce local statutes as we have shown.

Judge Moran's analysis places him in the position of one perceiving the occurrence of a legal wrong yet denying any remedy to the persons wronged. This does not, by itself, establish that he is in error, but it does invite our thoughtful analysis. Though we agree with Judge Moran's result, we deem it necessary to undertake our own *Cort v. Ash* analysis, adding ourselves to the many other circuit judges who have undertaken this task in line of duty.

■ To understand *Cort v. Ash* fully, it is necessary to note that it is a case where the proponent of an implied cause of action lost, by unanimous vote of all the Justices. The four standards explain why that claimant lost. Had he won, their meaning might be different. It is always an error to separate statements by Justices or judges from their context. The questions there stated to be the right ones are summarized. (422 U.S. at 78, 95 S.Ct. at 2087.)

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted?" [Emphasis in original.]

Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy?

Finally, is the cause of action one traditionally relegated to state law?

Appellants make a valiant effort to show their entitlement to an implied Federal cause of action under all four *Cort v. Ash* factors, but it is suggested that this court in *Indiana National Corp. v. Rich*, 712 F.2d 1180, 1182 (7th Cir.1983), treated the *Cort v. Ash* factors as somewhat outmoded. We cited *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2488, 61 L.Ed.2d 82 (1979) as establishing that the "factors were not of equal weight, but that the central inquiry, at which the first three factors were all directed, was one of congressional intent." We referred also to *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979) which anticipates Judge Moran in allowing implication of some private remedies, but denying enforcement by money damages. We do not think later Supreme Court cases, if they really modify *Cort v. Ash*, do so in a manner helpful to appellants' case. It cannot be unfair to them to make a full *Cort v. Ash* analysis, whether or not their failure on the second or intent issue is by itself decisive. We surmise that any dissatisfac-

tion with the factors arises from cases, such as *Touche Ross* where the intermediate courts have applied them too readily in favor of an implied cause of action.

In applying the first *Cort v. Ash* factor, we ask if nonproperty owners residing within 500 feet of an offending structure are persons for whose "especial benefit the statute was enacted." Here we need not doubt that Congress and the agency, HUD, all wanted the Housing Act to be administered in such a way that plaintiffs' class and others would not be avoidably harmed. The damage they might suffer from the neighborhood of dilapidated, abandoned, or vandalized government-owned structures was foreseen and so far as possible guarded against. But, bearing in mind that the necessity of foreclosure arises when a primary program has already failed, and that the object of administration between foreclosure and disposal is clearly to limit or avert the government's fiscal loss, and replenish the insurance fund, can it possibly be said the plaintiffs are *special* beneficiaries?

As regards the second factor, there is no indication of congressional intent to create a legal remedy, *i.e.*, a lawsuit, either in the statutory text or in the legislative history. There is plenty of evidence of expectation, if the HUD officials do a proper job, keeping the premises in repair, stopping vandalism, excluding drug users and criminal gangs, it will benefit the public fisc and incidentally make a better community. Plaintiffs are not enforcing a property right by the instant suit, for they claim to have none. They are not contract claimants. The idea that they have special rights by virtue of membership in the class of persons dwelling within 500 feet of the offending structure, stems from state law giving them access to state courts if they are in that category. It is not at all apparent that Congress intended to give special benefits to members of that identifiable group, in one particular state, in the special form of entry to the Federal courts to bring a lawsuit, where no such right is granted to others who might suffer incidental or indirect injury elsewhere if HUD officials do not do a proper job. No legislative history is cited to supply what the statutory language clearly does not supply.

It is not in any way inconsistent to say that Congress intended HUD officials to conform to local law in their management of foreclosed property in that location, yet that Congress did not intend the vagaries of other local law to confer implied causes of action on persons in that locality even though no such cause might have been implied in other localities.

As to the third factor, the remedies asserted are not consistent with the underlying legislative scheme. The officials are expected to act promptly as responsible businessmen would if similarly situated, for example, officers of a bank which has had to foreclose and finds itself willy-nilly in the business of real estate management and disposal. An invitation to Federal judges to peer over the shoulders of the management and interfere in the details of this business, would not further the underlying purposes. We are not here concerned with public-owned facilities, such as post offices, in whose management the public has an abiding interest lacking here. Enforcement by damages assessed against officials individually, as here proposed, would tend to make HUD management reluctant to foreclose, and thus they might fail to make the best use of the tools given them, the mortgage instruments, to limit and control government financial loss. Or are we also to visualize suit by members of the 500–foot class against HUD officials who have *failed* to foreclose?

Finally, the fourth *Cort v. Ash* factor is the only one which is even neutral so far as plaintiffs are concerned. The assessment of damages against Federal officials for nonperformance of official duties is not one normally relegated to state law.

The four factors, taken all together, fail to support the implication of a private remedy in the Federal courts under the housing legislation, of any form or description. That the HUD officials appear by the stipulation (as they do) not to have done things

they ought to have done, is true, but irrelevant. They owe their primary duty to their employer, the United States Government, and that employer has ample means at its disposal to enforce diligence by them, if it chooses to exercise its rights and sees them as thwarting its purposes.

Efforts to enforce implied causes of action under the National Housing Legislation or the HUD Handbook, have frequently come under consideration of appellate courts, and have always failed. Cases are:

*M.B. Guran Co. v. City of Akron,* 546 F.2d 201 (6th Cir.1976)—(Disappointed bidder's suit to enjoin award of a HUD-subsidized contract in alleged violation of a HUD Handbook. Court applies *Cort v. Ash* factors and states that the persons for "whose especial benefit the statute was enacted" are those who inhabit inadequate housing.)

*Falzarano v. United States,* 607 F.2d 506 (1st Cir.1979)—(No *Cort v. Ash* implied right of action accorded to tenants of HUD-subsidized housing for low, moderate income persons.)

*City of Rohnert Park v. Harris,* 601 F.2d 1040 (9th Cir.1979)—(Suit by city as *parens patriae* on behalf of persons injured to enjoin HUD and developers from developing a regional shopping center as part of a urban renewal project. Violation of various rules of Housing Act alleged. *Cort v. Ash* factors applied adversely to city.)

*Shivers v. Landrieu,* 674 F.2d 906 (D.C.Cir.1981)—(Past and present tenants of HUD mortgage-insured property have no right under *Cort v. Ash* standards to sue to enforce compliance with HUD regulations.)

*Jackson v. Lynn,* 506 F.2d 233 (D.C. Cir.1974)—(No implied right of action against HUD for insuring housing that did not conform to D.C. Housing Regulations, contrary to Section 221(d)(2) of Housing Act. This case decided before *Cort v. Ash.*)

In *United States v. Winthrop Towers,* 628 F.2d 1028 (7th Cir.1980), this court reviewed the legality of a HUD foreclosure

in a foreclosure suit brought by HUD. However, it held that HUD's main duty was to the mortgagee, not the mortgagor, and that negligent management and inspection were not affirmative defenses. That conclusion seems to accord with ours.

■ Mr. Rist by his contract undertook to perform duties as to management of foreclosed properties that otherwise the defendant HUD officials would have had to perform themselves. By his contract, he was to render various services as set forth in the appendix. There is nothing in the contract to show he was working for any outside persons as third-party beneficiaries. His duty was to protect the fiscal interests of the government. Nor does it appear that the *Cort v. Ash* factors work out more favorably for plaintiffs in their suit against him, than they do as to the HUD officials.

The short of it is that there are no provisions that express or imply an action in the Federal courts based on the kind of nonfeasance stipulated here. Since no such action is shown to lie, the question if it did lie, what kind of relief would be available to plaintiffs who have proved their case, whether injunction, declaratory judgment, or money damages, is an issue simply not reached. So far as the duties of the Federal officials included conformity to local law, this conclusion embraces those laws as well as Federal law.

As a matter of pendent jurisdiction, and as a separate issue, and in his discretion, the district judge also or again took up the breaches of local law that are stipulated, and held that by local law injunctive relief only was allowed. Since such relief was no longer sought, he entered summary judgment on the state claims as well. We do not understand that this part of his decision is before us on this appeal and therefore no further consideration of it is called for. We affirm the summary judgment as entered.

B. *The cross-appeal.*

■ The official defendants cross-appeal respecting the refusal of the district judge

to award costs to them, having decided in their favor. In his order he noted that the case, though not a "landmark," did present novel questions of public interest and importance, that plaintiffs were of limited means (not stated to be indigent) and were not suing for commercial advantage or private gain. He cited *Delta Air Lines, Inc. v. Colbert*, 692 F.2d 489 (7th Cir.1982). These grounds for relieving a loser from what is by Fed.R.Civ.P. 54(d) the "of course" normal consequence of losing, are not by themselves sufficient to avoid abuse of discretion under the rule.

This conclusion suffices to dispose of the cross-appeal, and any discussion whether the suit was frivolous is tempting though not strictly relevant. It cannot be denied that plaintiffs had a legitimate grievance, whether or not a cause of action. By the commonly accepted belief of the lay public, one thinking he has such a grievance has a Constitutional right to sue in the most convenient court, without too nice a study of the jurisdiction and jurisprudence of the selected tribunal. If he has chosen the wrong one, its judge is not aggrieved because he has only to throw the case out or transfer it to the proper court. Understandably this view lacks a following among judges, but all must be aware of its existence as a tide they must swim with or against. What use is made of the first opportunity afforded under the Rules of the chosen court to get rid of a misfiled case thus takes on more importance than many realize. To use this opportunity, if the case does not belong in the court chosen, is to swim with the tide, so to speak, whereas to labor on with the case is not. Here, the first opportunity was a motion by defendants to dismiss on the pleadings, that came before another district judge, not Moran. Under date of October 11, 1978, it was held that the motion was denied because a cause of action was stated under 42 U.S.C. § 1441. (See Appendix for text of this section). Record Vol. I, Item 27. It appears the denial was legal error as the petition did not state a cause of action within the limited jurisdiction of the Federal courts—could not have if our decision is

right. This act lent dignity to the case and set the stage for the forensic combat that followed. It was made unethical for counsel not to prosecute the claim as he did. In these circumstances, responsibility for causing waste of judicial resources on an unmeritorious case does not rest wholly or even primarily upon plaintiffs and their counsel. Here the cause was failure of the judicial machinery to operate as it was intended to under the F.R.C.P.

### APPENDIX A

*Relevant Statutory Provisions*

The Housing Act of 1949, 42 U.S.C. § 1441, provides in pertinent part:

> The Congress hereby declares that the general welfare and security of the Nation and the health and living standards of its people require housing production and related community development sufficient to remedy the serious housing shortage, the elimination of substandard and other inadequate housing through the clearance of slums and blighted areas, and the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family, thus contributing to the development and redevelopment of communities and to the advancement of the growth, wealth, and security of the Nation .... The Department of Housing and Urban Development, and any other departments or agencies of the Federal Government having powers, functions, or duties with respect to housing, shall exercise their powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established ....

The Department of Housing and Urban Development Act, as amended, 42 U.S.C. § 1441a, provides:

> (a) The Congress finds that the supply of the Nation's housing is not increasing rapidly enough to meet the national

housing goal, established in the Housing Act of 1949, of the "realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family". The Congress reaffirms this national housing goal and determines that it can be substantially achieved within the next decade by the construction or rehabilitation of twenty-six million housing units, six million of these for low and moderate income families.

(b) The Congress further finds that policies designed to contribute to the achievement of the national housing goal have not directed sufficient attention and resources to the preservation of existing housing and neighborhoods, that the deterioration and abandonment of housing for the Nation's lower income families has accelerated over the last decade, and that this acceleration has contributed to neighborhood disintegration and has partially negated the progress toward achieving the national housing goal which has been made primarily through new housing construction.

(c) The Congress declares that if the national housing goal is to be achieved, a greater effort must be made to encourage the preservation of existing housing and neighborhoods through such measures as housing preservation, moderate rehabilitation, and improvements in housing management and maintenance, in conjunction with the provision of adequate municipal services. Such an effort should concentrate, to a greater extent than it has in the past, on housing and neighborhoods where deterioration is evident but has not yet become acute.

The National Housing Act, 12 U.S.C. § 1713, provides in pertinent part:

(k) *Acquisition of property by conveyance or foreclosure.* The Secretary is hereby authorized either to (1) acquire possession of and title to any property, covered by a mortgage insured under this section and assigned to him, by voluntary conveyance in extinguishment of the mortgage indebtedness, or (2) institute proceedings for foreclosure on the property covered by any such insured mortgage and prosecute such proceedings to conclusion ....

(l) *Handling and disposal of property; settlement of claims.* Notwithstanding any other provisions of law relating to the acquisition, handling, or disposal of real and other property by the United States, the Secretary shall also have power, for the protection of the interests of the General Insurance Fund, to pay out of the General Insurance Fund all expenses or charges in connection with, and to deal with, complete, reconstruct, rent, renovate, modernize, insure, make contracts for the management of, or establish suitable agencies for the management of, or sell for cash or credit or lease in his discretion, any property acquired by him under this section ....

The National Housing Act, as amended, 12 U.S.C. § 1702, provides, in pertinent part:

The powers conferred by this Act shall be exercised by the Secretary of Housing and Urban Development (hereinafter referred to as the "Secretary"). In order to carry out the provisions of this title and titles II, III, V, VI, VII, VIII, IX, X, and XI, the Secretary may establish such agencies, accept and utilize such voluntary and uncompensated services, utilize such Federal officers and employees, and, with the consent of the State, such State and local officers and employees, [and appoint such other officers and employees as he may find necessary ....] The Secretary shall, in carrying out the provisions of this title and titles II, III, V, VI, VII, VIII, IX, X, and XI be authorized, in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal.

Ill.Rev.Stat. ch. 24, § 11–31–1, as amended, provides, in pertinent part:

§ 11–31–1. The corporate authorities of each municipality may demolish, repair or cause the demolition or repair of dangerous and unsafe buildings or uncompleted and abandoned buildings within the territory of any such municipality

.... No building may be boarded up or otherwise enclosed.

The Municipal Code of the City of Chicago, § 39–13, provides, in pertinent part:

39–13. Any person or persons owning, maintaining, operating, collecting rents for, or having any legal or equitable interest in any vacant and open building, or any uncompleted abandoned building, or any vacant boarded-up building or any otherwise enclosed vacant building must have a watchman on duty upon the premises on which any one of such aforementioned buildings is situated every day continuously between the hours of 4:00 P.M. and 8:00 A.M.

Said watchman required under the provisions of this ordinance shall remain on duty daily during the required hours until such building is either occupied or razed ....

The Municipal Code of the City of Chicago, § 99–4, provides, in pertinent part:

99–4. No building, vehicle, structure, receptacle, yard, lot, premises, or part thereof, shall be made, used, kept, maintained, or operated in the city if such use, keeping, maintaining, or operating shall be the occasion of any nuisance, or shall be dangerous to life or detrimental to health.

Every building or structure constructed or maintained in violation of the building provisions of this code, or which is in an unsanitary condition, or in an unsafe or dangerous condition, or which in any manner endangers the health or safety of any person or persons, is hereby declared to be a public nuisance. Every building or part therof which is in an unsanitary condition by reason of the basement or cellar being covered with stagnant water, or by reason of the presence of sewer gas, or by reason of any portion of a building being infected with disease or being unfit for human habitation, or which by reason of any other unsanitary condition, is a source of sickness, or which endangers the public health, is hereby declared to be a public nuisance.

*Relevant Portions of the HUD Property Disposition Handbook*

Paragraph 23, Chapter 2, of the HUD Handbook provides, in pertinent part:

b. *The repair program* shall include all repairs necessary to create maximum sales appeal and eliminate existing or potential structural, mechanical and other deficiencies. In addition, the repair program should include such upgrading which, because of type and location of the properties, the Director determines necessary to generate sales, or to stabilize or improve neighborhoods. In establishing the repair program, particularly where inner-city, core-area properties are involved, it is important to be aware of the salutary effect that will probably result. The timely provision of repair or substantial rehabilitation may be critical to the preservation of blocks and even neighborhoods in older areas of our cities and suburbs. Typically, in older but still sound neighborhoods, the rehabilitation of one house on the block can lead to investment in upgrading other houses on the block. The result of the repair program with respect to deteriorating or substandard housing should be to create a structure in like-new condition, with all components operable, and with no major expense in the offing for several years. All major repair work shall be accomplished in accordance with established formal contracting and purchase order procedures.

\* \* \* \* \* \*

g. *Immediate Protective Repairs.* Irrespective of whether full repairs are delayed, immediate attention shall be given to those repairs required to prevent undue deterioration and eliminate hazardous conditions that may be dangerous to the public.

h. *Initial Cleanup and Maintenance.* It is essential that unsightly conditions be corrected promptly. Imme-

diately upon taking possession the Area Management Broker (AMB) or the local office, if an AMB is not available, shall make arrangements to have all rubbish removed and the premises given a thorough cleaning, including cutting of grass, weeding, and trimming of shrubbery if needed.

i. *Continued Maintenance.* In addition to the initial cleaning, arrangements shall also be made for continued "housekeeping" maintenance, such as care of shrubbery and lawns, snow removal and broom cleaning. Unoccupied properties must be maintained in clean and presentable condition.

Paragraph 185, Chapter 7 of the HUD Handbook provides, in pertinent part:

*Repair and Maintenance Objectives.*

a. *The overall objective* is to (a) place properties in first-class condition to create maximum sales appeal at the highest obtainable sales price in order to contribute to maintenance of a firm real estate market; (b) eliminate potential default hazard attributable to physical deficiencies; and (c) eliminate all structural, (including termite infestation) mechanical and surface deficiencies which, if not eliminated, would result in major repair or replacement expenditures by the purchaser, or demands upon HUD under the terms of the warranty on the Sales Contract, Form 2384.

Paragraph 80, Chapter 3, of the HUD Handbook, provides in pertinent part:

80. *Supervision of Area Management Brokers.* In order to obtain quality performance on a timely basis, the CPO shall be responsible for assuring that each area management broker (AMB) understands what is expected of him, and that he is familiar with the standards of acceptable performance established by the local office for all activities under his supervision. The CPO shall supervise the activities of each AMB to the extent necessary to develop and maintain top quality management services. Where an AMB is new to the program, the CPO shall expend a sufficient amount of time, either personally or by a qualified staff member, in training and supervising the AMB and his employees who are engaged in performing the services required under the broker contract.

*Relevant Portions of Seward Rist's AMB Contract*

The AMB Contract, Article 3, provides, in pertinent part:

ARTICLE 3.—FACILITIES, MATERIALS, LABOR AND SERVICES TO BE FURNISHED BY THE CONTRACTOR:

In consideration for compensation as stipulated in this contract the Contractor agrees to perform in accordance with the following requirements at no additional expense to the Government except as provided herein.

\* \* \* \* \* \*

d. SERVICES: The requisite time, attention and effort of the principals and employees regularly engaged in the established business of the Contractor to properly discharge the obligations and responsibilities of the Contractor as established hereunder, including supervision of all repair, maintenance and operating activities.

The AMB Contract, Article 4, provides, in pertinent part:

ARTICLE 4.—INITIAL SERVICES TO BE *PERFORMED* BY THE CONTRACTOR

The Contractor shall perform the following initial services stipulated with his regular employees at no additional expense to the Government.

d. Informing the Government promptly concerning all damage resulting from vandalism, fire, windstorm, and other causes at the outset and thereafter as circumstances require.

The AMB Contract, Article 5, provides:

ARTICLE 5.—INITIAL SERVICES TO BE *OBTAINED* BY THE CONTRACTOR

The Contractor shall arrange for and supervise the following initial services in accordance with all the terms and conditions herein and specifically Article 9 and the limitations imposed under Article 10. The actual repair or maintenance costs shall be reimbursable from project funds or through the U.S. Treasury, or paid direct by the Government through the U.S. Treasury, as appropriate.

a. Winterizing of all operating systems and equipment, as to all properties vacant at the outset or subsequently vacated or at such other time as conditions require;

b. Removal from the premises of all trash and debris, both as to interior and grounds;

c. Securing the properties against unauthorized entry and damage by the elements at the outset and thereafter as needed;

d. Mowing the grass and trimming the shrubbery[.]

The AMB Contract, Article 7, provides in pertinent part:

ARTICLE 7.—CONTINUING SERVICES TO BE *OBTAINED* BY THE CONTRACTOR

The Contractor shall arrange for and supervise the following continuing services in accordance with all the terms and conditions hereof and specifically Article 9 and the limitations imposed under Article 10. The actual repair or maintenance costs shall be reimbursable from project funds or through the U.S. Treasury, or paid direct by the Government through the U.S. Treasury, as appropriate.

a. Continuing maintenance of buildings and grounds ....

The AMB Contract, Article 8, provides, in pertinent part:

ARTICLE 8.—CUSTODIAL SERVICES: The Contractor shall perform custodial services on vacant properties assigned hereunder which are encumbered by mortgages assigned to the Secretary under contracts of mortgage insurance or when the property has been abandoned and the Secretary holds a purchase money mortgage taken back in connection with the sale of such property or other form of legal possession of which the Secretary does not hold free and clear title to such property.

Contractor shall also provide for the protection and preservation of such properties. However, actions of this nature shall be limited to those necessary for the prevention of health hazards and minimum security measures to prevent damage to the property by the elements or by vandalism.

POSNER, Circuit Judge, concurring.

I join Judge Nichols' opinion, but his laconic disposition of the cross-appeal leads me to add a statement of my own view of why the district court's refusal to award the defendants, as the winning parties, their costs of suit under Rule 54(d) should be reversed.

■ Under the rule, "costs shall be allowed as of course to the prevailing party unless the [district] court otherwise directs." As an original matter this language could be interpreted to give the district judge an essentially unreviewable discretion to award or not to award costs to the winning party as the judge pleased. But this court has not interpreted the rule thus. We have said it establishes a " 'principle of preference' " (quoting Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747, 768 (1982)) that in all but exceptional cases requires the judge to award costs to the winning party, whether plaintiff or defendant. See *Coyne-Delany Co. v. Capital Development Bd.*, 717 F.2d 385, 392 (7th Cir.1983); *Delta Air Lines, Inc. v. Colbert*, 692 F.2d 489, 490 (7th Cir.1982); *Popeil Bros., Inc. v. Schick Elec., Inc.*, 516 F.2d 772, 774–76 (7th Cir.1975). Since "the ingredients of a proper decision [to withhold costs] are objective factors ... accessible to the judgment of a reviewing court," *Coyne-Delany Co. v. Capital Development Bd., supra*, 717 F.2d at 392, we must determine whether such factors are present here.

The plaintiffs argue only two factors. The first, that they are persons of limited monetary means, is entitled to little weight in a case such as this where the defendants are (with the exception of a broker hired by HUD to manage the property in question) public officials whose expenses of suit were borne by the United States, which is to say by the federal taxpayer. Most taxpayers are persons of limited means; most government revenue is raised from such persons, and not from the wealthy few. The denial of costs to the defendants in this case will not contribute, however slightly, to a more egalitarian distribution of the nation's wealth.

The second factor that the plaintiffs ask us to consider is whether, if they had won the case, it would have been a "landmark" decision; they argue that the efforts of litigants who press for fundamental changes in the law should be subsidized, lest the high risk of losing deter such litigants. I question the validity of this argument in today's legal climate. The federal courts are choking with litigation, much of it completely meritless; fear of losing seems not to be much of a deterrent. And to reward the loser of what would have been a landmark case if he had won creates the following paradox: the more frivolous the suit, the greater the landmark it would establish in the unlikely event that it succeeded, and hence the stronger the argument for denying the winner his costs. A successful suit to overrule *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and thus make racial segregation in public schools once again lawful, would be one of the all-time legal landmarks. No one takes the landmark argument for forgiving the loser's costs that seriously; no one argues for interpreting Rule 54(d) to encourage the bringing of lawsuits that have no reasonable chance of succeeding, merely because if they did succeed they would work a legal revolution. The present lawsuit had no reasonable chance of succeeding, and in fact borders on the frivolous.

As part of its program for subsidizing the housing needs of veterans, the poor, and others, HUD guarantees mortgage loans on houses in which members of these groups live. It is said that the high rate of default on its loans to owners of housing for poor people has made HUD, through foreclosure, the biggest owner of slum property in the United States. After foreclosure, with the property standing tenantless, deterioration often is rapid and complete, and was in this case, where HUD lost its entire investment in the property and the neighbors got a blight, an eyesore, and maybe even a menace, to contend with. Such are the unintended effects of public benevolence. They are very unfortunate; but to think, as these plaintiffs did, that the federal courts are authorized to provide a remedy is wishful thinking. They would be authorized only if there had been an invasion of the plaintiffs' federal legal rights; but as Judge Nichols explains, there is nothing in 42 U.S.C. § 1441a, the statute on which this suit is founded, to suggest that Congress meant to provide legal protection to neighbors of subsidized housing from the side effects—foreclosure, abandonment, deterioration—of federal housing subsidies. When the statute speaks of " 'a suitable living environment,' " "the preservation of existing housing and neighborhoods," and "neighborhood disintegration" and "deterioration," it is referring not to the neighbors of the subsidized homeowners but to the subsidized homeowners themselves. It is their living conditions, not those of their neighbors, that the subsidy programs seek to protect and improve. To give the neighbors rights of action against HUD and its officials—whether equitable, to force HUD to spend whatever money is necessary to prevent a building that it has taken over by foreclosure from deteriorating, or legal, to compensate the neighbors for the nuisance created by HUD's neglect—will only compound the cost to HUD of having to foreclose on its loans. Instead of just having to write off a loan, which is bad enough, HUD would, under the plaintiffs' interpretation of the statute, have to pay out additional money to the mortgagor's neighbors—money that

would otherwise be available to improve the stock of housing. The program would be made more expensive, and the intended beneficiaries would obtain no net benefit from the additional expenses. The plaintiffs ask us to bring about this result by playing a purely verbal trick: defining "neighborhood" to mean the set of neighbors of subsidized housing, though in the statute the word simply means the area where the inhabitants of subsidized housing live. Compare Neighborhood Development Programs Act, 42 U.S.C. §§ 1469 *et seq.*

In tracing out the likely consequences of the plaintiffs' interpretation of the statute, I have assumed that they are seeking damages just from HUD. The idea that Carla Hills, who was President Ford's Secretary of Housing and Urban Development, might be personally liable for the untoward consequences of HUD's programs during her tenure—a liability that might run into the hundreds of millions of dollars—is almost too silly for words, especially when one considers that there is no indemnification of federal officers against whom a judgment is levied. But public liability would be bad enough. It would as I have said increase the costs of the government's housing programs and do so for the benefit of those frequently implacable opponents of the programs, the neighbors of the subsidy recipients. See, e.g., *Gautreaux v. Pierce,* 707 F.2d 265 (7th Cir.1983). To seek a warrant for such liability in the housing law itself requires the exercise of an inflamed rather than merely creative legal imagination and should not be encouraged by giving the Don Quixotes who brought this suit the moral victory (slight as it is) of being excused from paying the defendants' costs.

It does not matter in this case which approach we take to the question of deciding whether a statute that does not expressly create a private remedy for its violation is nevertheless enforceable by private persons. As Judge Nichols explains, the plaintiffs flunk the multi-factored test laid down in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Although

*Cort* is still cited often enough, there is some doubt whether its test remains authoritative. See *California v. Sierra Club,* 451 U.S. 287, 302–03, 101 S.Ct. 1775, 1783–84, 68 L.Ed.2d 101 (1981) (concurring opinion). The more recent cases suggest a simpler test, whether Congress intended the courts to create a private remedy. See, e.g., *Daily Income Fund, Inc. v. Fox,* —— U.S. ——, 104 S.Ct. 831, 839, 78 L.Ed.2d 645 (1984). The plaintiffs flunk this test too. And even under the most liberal test (no longer in vogue)—that of *Texas & Pac. Ry. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916)—whereby if a violation of the statute "results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied," the plaintiffs could not win this case. They are not among the statute's intended beneficiaries.

I have said that the suit had no fair chance of succeeding. This is evident even if we consider the plaintiffs' pendent claims, whose dismissal by the district judge the plaintiffs have not appealed. Because the federal claim was dismissed on motion for summary judgment, it was not proper for the district judge even to reach the merits of any of the pendent claims; he should have relinquished jurisdiction over them. When the federal claims in a case are dismissed before trial, the considerations of judicial economy that underlie the doctrine of pendent jurisdiction are diminished and are outweighed by the inroads that the doctrine makes into the autonomy of state courts in matters of state law. It is therefore the rule that, unless there are special circumstances, dismissal of the federal claim before trial requires the district judge to decline to exercise pendent jurisdiction over any state-law claims. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 278 (1966); *Bernstein v. Lind-Waldock & Co.,* 738 F.2d 179, 187 (7th Cir.1984). There were no special circumstances here. Although the suit had been going on for a long time, and the district

judge was concerned that the plaintiffs would have a statute of limitations problem if they started over in state court, they would not have. See Ill.Rev.Stat., ch. 110, ¶ 13–217. The district court also noted that the defendants would be entitled by 28 U.S.C. § 1442(a)(1) to remove a state court action brought against them. See *Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969). But the district court should not have made the decision to remove for the defendants by retaining the pendent claims.

Finally, personal sympathy is not a proper basis for withholding an award of costs under Rule 54(d). The district judge, reacting as a citizen, did not like the way in which a federal program was administered in this case, and so he punished the government by denying the defendants their costs. If I thought it relevant to my judicial duty I would attempt to evaluate the program in this light and in the end might agree with his assessment. But it is no business of mine as a judge whether government programs work well or badly, fairly or unfairly, provided they do not violate anyone's legal rights; and it seems to me clear beyond argument that nothing the defendants did or failed to do in this case violated any legal right of these plaintiffs that was within the district court's power to enforce.

FLAUM, Circuit Judge, concurring in result.

I agree with my brethren that we should affirm the district court's rejection of the plaintiff's claims, and that the district court abused its discretion in denying the defendants their costs under rule 54(d).

As a line of recent Supreme Court cases makes clear, the ultimate issue in a case such as this is whether Congress intended to create a private right of action at the time it enacted the statute in question. *See, e.g., Daily Income Fund v. Fox,* —— U.S. ——, 104 S.Ct. 831, 838, 78 L.Ed.2d 645 (1984); *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 377–78, 102 S.Ct. 1825, 1838–39, 72 L.Ed.2d 182 (1982); *Texas Industries v. Radcliff Mate-*

*rials, Inc.,* 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981); *Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245–246, 62 L.Ed.2d 146 (1979). Thus, "[t]he question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries." *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981). Congressional intent may be discerned by examining a number of factors, including the statute's legislative history, the statute's purpose, the overall legislative scheme, the identity of the class for whose particular benefit the statute was passed, the existence of express statutory remedies adequate to serve the legislative purpose, and the traditional role of the states in affording the relief claimed. *See Daily Income Fund v. Fox,* 104 S.Ct. at 839; *Texas Industries v. Radcliff Materials, Inc.,* 451 U.S. at 639, 101 S.Ct. at 2066.

The ultimate goal of our national housing policy, including that policy embodied in the National Housing Act, is "a decent home and suitable living environment for every American family ...." 12 U.S.C. § 1701t (1982); 42 U.S.C. § 1441 (1982). The plaintiffs have argued that an important part of this national housing policy is the maintenance and preservation of urban neighborhoods. While I do not question this proposition, *see* 42 U.S.C. § 1441a & b (1982), there is no legislative history or other evidence indicating that Congress intended to address the problem of neighborhood disintegration by conferring on neighbors of HUD-owned property the right to sue HUD for damages suffered as a result of the deterioration of that property. In fact, it is not clear that providing neighbors of HUD-owned property with such a right is even consistent with the ultimate goal of national housing policy, the provision of decent housing for all Americans. The plaintiffs argue that providing them with a damage remedy will serve the purpose of "deterring defendants' policy of neglect in the future.' Appellants' Brief at 14. It may be, however, that the problems associated with HUD's property disposition program are of such complex origin that they do not

lend themselves to a simple solution. I would not find an implied private right of action here on the basis of such a speculative deterrence theory. The plaintiffs also argue that the Housing Act gives them a right to a decent neighborhood, which entitles them to damages in this case. However, even assuming that the Housing Act did give them some rights as neighbors, these rights certainly are not as important in the legislative scheme as the rights of persons to whom HUD actually provides housing. This is significant because, as the court below observed, "[t]o grant neighborhood residents a damage remedy for injuries resulting from their proximity to hazardous housing would just divert funds from the provision of adequate housing." *Burroughs v. Hills*, 564 F.Supp. 1007, 1017 (N.D.Ill.1983). Thus, there is no reason to find an implied private right of action for damages in this case.

Because the plaintiffs' claim for injunctive relief became moot in the court below, there is an argument that the issue of whether they would have had a private right of action for injunctive relief under the Housing Act is not before us. Neither party has made this argument, however. In fact, the defendants have argued that the plaintiffs have no private right of action at all, and the plaintiffs have argued that the district court erred because it found that the plaintiffs did have rights as neighbors under the Housing Act, but it failed to give them an effective means for vindicating those rights (a damage remedy) in this case. I agree with the parties that the injunctive relief and damages issues are intertwined, and, since the district court's opinion might be interpreted as suggesting that the plaintiffs would have had a cause of action for injunctive relief, I believe it is appropriate that we decide

whether the Housing Act provides the plaintiffs with any private right of action to force HUD to maintain its property.

I can find no evidence that, in enacting the Housing Act, Congress intended to create a private right of action for injunctive relief for persons such as the plaintiffs in this case. There is no legislative history suggesting such an intention, and my view that neighbors of HUD-owned property are not the primary beneficiaries of the Housing Act further militates against our finding a private right of action in this case. In addition, this is a case in which we should consider "the traditional role of the states in affording the relief claimed." *Daily Income Fund v. Fox*, 104 S.Ct. at 839. Persons harmed unreasonably by conditions on neighboring property traditionally have been able to enjoin those conditions through suits based on state common law theories or state or local statutes. In this case, for example, the plaintiffs originally sought injunctive relief in part based on an Illinois statute, Ill.Rev.Stat. ch. 24, § 11–13–15, which provides that owners or tenants who are adversely affected by their neighbor's violation of certain municipal ordinances may sue to restrain, correct, or abate the violation. Even assuming it considered the matter at all, Congress undoubtedly would have been aware of the traditional role played by state and local law in providing injunctive relief for persons injured by conditions on their neighbor's property. This consideration lends further support to the conclusion that Congress did not intend that there be any private right of action for the plaintiffs in this case.[1]

■ Turning to the question of costs under rule 54(d), I find that the district court's refusal to award the defendants their costs was an abuse of discretion. In

**1.** This position assumes that Congress did not intend that HUD be immune from such suits. In 12 U.S.C. § 1702 (1982), Congress provided that the Secretary of HUD may "sue and be sued" in her official capacity in connection with the carrying out of certain provisions of the National Housing Act, including the provisions relevant to this case. This court has not decided whether the § 1702 waiver provision would apply where the Secretary of HUD is sued under

state law to force her properly to maintain or repair property that HUD had acquired through mortgage foreclosure. Although there is no need to decide this question here, I note that there is significant authority suggesting that § 1702 was meant to permit such suits. In *Federal Housing Administration v. Burr*, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940), the Supreme Court interpreted § 1702 broadly. It stated that absent a clear showing that a particu-

this circuit, there is a presumption that costs should be awarded to the prevailing party, and the losing party must overcome this presumption to avoid liability for costs. *Delta Air Lines, Inc. v. Colbert,* 692 F.2d 489, 490 (7th Cir.1982). Historically, this court has found the presumption to be overcome only where there has been some fault, misconduct, default, or other action worthy of penalty on the part of the prevailing side. *Id.* Recently, this court held that a losing party also may overcome the presumption by a showing of indigency. *Badillo v. Central Steel & Wire Co.,* 717 F.2d 1160, 1165 (7th Cir.1983).

The plaintiffs have not argued, and the court below did not find, that the defendants deserve to be penalized for their conduct in this litigation. Although the district court did state that the plaintiffs are "of limited means," I do not interpret this as a finding of indigency. Thus, none of the previously recognized grounds for refusing costs to the prevailing party are present in this case. Moreover, there is no need to expand existing law in this area. While this case may have presented novel questions of public interest and importance, as the district court found, this is an insufficient reason to depart from the normal rule of awarding costs to the prevailing party. The District of Columbia Circuit has explained: "Unlike attorneys' fees, whose magnitude and unpredictability have discouraged parties with otherwise meritorious claims from litigation, the small and predictable costs of court fees, printing, and court reporters' fees have customarily been viewed as necessary and reasonable incidents of litigation, properly reimbursa-

ble to the winning party." *Baez v. United States Department of Justice,* 684 F.2d 999, 1003 (D.C.Cir.1982). Thus, in the absence of a finding that the plaintiffs are indigent, there is no realistic concern that awarding costs to the defendants here will discourage persons from attempting to vindicate their rights in federal court. In short, there is no compelling reason in this case to alter the normal rule of awarding costs to the prevailing party.

Finally, with regard to the plaintiffs' state law claims, the denial of those claims by the district court was not appealed to this court. Thus, I find it not only unnecessary but also inappropriate for this court to decide whether those claims should have been entertained by the district court.

lar type of suit is inconsistent with the statutory scheme or would gravely interfere with the performance of a governmental function, or that Congress plainly intended to use the "sue and be sued" clause in a narrow sense, "it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with the authority to 'sue or be sued,' that agency is not less amenable to judicial process than a private enterprise under like circumstances would be." 309 U.S. at 245, 60 S.Ct. at 490. *See also Merrill Tenant Council v. HUD,* 638 F.2d 1086, 1090 (7th Cir.1981) (HUD not immune from suit brought by tenants of HUD-owned or operated property to recover

interest on security deposits owed them under state law); *Knox Hill Tenant Council v. Washington,* 448 F.2d 1045, 1050–53 (D.C.Cir.1971) (holding, under different federal housing laws than those involved here, that tenants of HUD-owned property may sue HUD for declaratory and injunctive relief under local and federal law regarding alleged failure properly to maintain property); *Estrada v. Hills,* 401 F.Supp. 429, 433 (N.D.Ill.1975) (§ 1702 permits suit against HUD officials by neighbors of HUD-owned property alleging failure properly to maintain that property, though officials whose duties are discretionary are immune from liability for money damages).